UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:                                                :
                                                      :        Case No. 08-13153 (SMB)
RIDGEMOUR MEYER PROPERTIES, LLC,                      :        Chapter 11
                                                      :
                    Debtor.                           :
------------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER GRANTING
## MOTION TO APPOINT CHAPTER 11 TRUSTEE

**A P P E A R A N C E S :**

KLESTADT & WINTERS, LLP
Counsel to Debtor
292 Madison Avenue
New York, New York 10017-6314

      Tracy L. Klestadt, Esq.
          Of Counsel

JEFFREY H. WEINBERGER, ESQ.
Special Counsel to Debtor
23 Margaret Court
Great Neck, New York 11024

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Counsel to Ginsberg Development Companies, LLC
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

      Joseph L. Schwartz, Esq.
          Of Counsel

UNITED STATES TRUSTEE
33 Whitehall Street – 21st Floor
New York, New York 10004

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

Ridgemour Meyer Properties, LLC ("RMP" or the debtor) is a co-venturer with Ginsburg Development Companies, LLC ("GDC") in the development of certain real property located in Westchester County. While the parties were engaged in arbitration relating to the fate of their venture, the debtor filed its chapter 11 petition, and GDC immediately responded with alternative motions to dismiss the case as a bad faith filing or appoint a chapter 11 trustee. GDC also sought sanctions.

The Court conducted a three-day evidentiary hearing during which GDC withdrew its alternative request for dismissal of the case. The Court now concludes, for the reasons that follow, that a chapter 11 trustee should be appointed.

## FACTS

The debtor is a New York limited liability company. The two members of the debtor are Ridgemour Development Corporation, or RDC, and W&A Development, LLC, or WA, each owning 50%. A.J. Rotonde is the president and principal of RDC; William Meyer is the principal of WA. In December 2003, the debtor formed a joint venture known as Pinnacle-Westchester LLC ("Pinnacle") with GDC for the purpose of developing and erecting a high rise building in White Plains, New York.[1]

A management committee consisting of four directors ran Pinnacle, with the debtor and GDC each appointing two. GDC appointed Martin Ginsburg and Christine McWalters; the debtor appointed Rotonde and Meyer.

---

[1] The Pinnacle Operating Agreement was received in evidence as Exhibit 1. Unless stated otherwise, the designation "Ex." refers to the exhibits received in evidence at the hearing.

Pinnacle's assets consisted of real property, the rights to acquire other real property and cash.  According to § 3.1 of the Pinnacle Operating Agreement, the debtor contributed (1) a parcel of land known as the "Primary Lot" that was subject to a mortgage in the approximate amount of $3,386,000 held by Merida Associates, Inc., (2) a contract right to purchase real property known as the "Back Lot," (3) a contract right to purchase a second parcel, and (4) certain air rights.  GDC agreed to contribute up to $4 million.

The debtor subsequently sold a third lot to Pinnacle -- the "Jomas Lot" -- for $6.9 million.  Pinnacle assumed a first mortgage of approximately $3.5 million held by Toano Realty.  Pinnacle borrowed $3.4 million from Wachovia Bank to fund the balance of the purchase price, and paid that approximate amount to the debtor.  Ginsburg personally guaranteed the Wachovia debt.  The three properties owned by Pinnacle -- the Primary Lot, the Back Lot and the Jomas Lot -- are contiguous, and unless otherwise indicated, are referred to collectively as the "Property."

**A.    The Arbitration**

**1.    The 6/18 Email**

By 2006, if not sooner, the debtor and GDC became deadlocked over the future of Pinnacle.  The debtor still hoped to develop the Property, but GDC sought to dissolve the venture.  On or about November 22, 2006, GDC commenced an arbitration in accordance with the Pinnacle Operating Agreement against the debtor, Meyer and Rotonde.  After conducting several days of evidentiary hearings, the arbitrator sent the parties an email on June 18, 2008 (the "6/18 Email").  (See Ex. 18.)  The 6/18 Email first recapped what had occurred that day in the hearings before the arbitrator.  The arbitrator concluded that the

3

evidence did not justify Pinnacle proceeding with the development.  Accordingly,

Pinnacle would be dissolved.

The arbitrator next ruled that due to the damages incurred by the debtor resulting

from GDC's management of Pinnacle, "control of the property shall be returned to

RMP."  The arbitrator stated that this ruling did not preclude compensating GDC for its

cash investment in Pinnacle, but the monetary issues would be determined only after a

full trial on the damages claims.  He explained that he was making this ruling to enable

the parties to prepare for discussions scheduled for the next day.  Those discussions

would focus on the proper method of dissolving Pinnacle absent ownership of the land,

and allowing the debtor to develop the Property without further loss or delay.

## 2.  The June 19th Hearing

The arbitrator conducted a hearing the next day.  Rotonde, Meyer and Donald

Carbone, Esq. attended on behalf of the debtor.   Aside from discussions and

disagreements regarding the arbitrator's authority to order the transfer of the Property to

the debtor, both sides focused on the conditions to the transfer.  GDC contended that it

had invested or was owed nearly $15 million.  The debtor contended, based on the

arbitrator's statement in the 6/18 Email, that it had been damaged by GDC in an

unliquidated amount.

As a practical matter, GDC was afraid that if the Property was transferred to the

debtor, GDC would be unsecured, and moreover, the debtor could transfer or encumber

the Property.  (Ex. 4 at 1903-06.)  It insisted that its rights be protected through a

mortgage placed on the Property to secure its claim, pending a resolution of the monetary issues.

Meyer recognized that a mortgage was a <u>quid pro quo</u> for the conveyance of the Property; the issue that divided the parties was the amount of the mortgage.  In response to GDC's concerns, Meyer acknowledged that "in order for us [the debtor] to be able to move forward and get title, we would give you the mortgage now with the understanding that it would increase or decrease."  (<u>Id.</u> at 1945.)

After the lunch break, the parties announced a resolution.  GDC's lawyer, Gerald Liloia, Esq., acknowledged that the debtor already had "control" of the Property, and Meyer agreed that the debtor would indemnify GDC for any actions that it took.  (<u>Id.</u> at 1979-80.)  The debtor would grant GDC a mortgage in the sum of $14.629 million.  The amount of the mortgage could rise or fall depending on the resolution of the debtor's damages claim against GDC.  Meyer stated that the debtor would be prepared to move forward on that basis in order to keep control of the Property.  GDC's attorney volunteered to draft the "mortgages and conveyance documents" and Meyer agreed.  (<u>Id.</u>)

The arbitrator memorialized the rulings contained in his 6/18 Email and made at the June 19th hearing in an "Interim Award," dated July 9, 2008.  (<u>See</u> Ex. 15.)  The Interim Award provided, in pertinent part that (1) Pinnacle would be dissolved, (2) ownership of the Property would be transferred from Pinnacle to the debtor, (3) the debtor would execute a note and mortgage in GDC's favor in the sum of $14.629 million to secure the repayment of monies that GDC had invested or expended on behalf of Pinnacle, (4) the amount of the note and mortgage could increase or decrease based on

the disposition of the debtor's damage claims, and (5) the debtor would indemnify
Pinnacle, GDC and Ginsburg from any liability arising from its efforts to develop the
Property after the date of the transfer <u>or arising from the debtor's actions prior to the date
of the transfer</u>.  Each component was contained in a separate paragraph.

In the meantime, the parties began to prepare the necessary documents.  On June
25, 2008, Carbone sent Jonathan Vuotto, Esq., GDC's lawyer, a draft assignment of
certain contract rights and draft warranty deeds covering the three lots that comprised the
Property.  (<u>See</u> Ex. 5.)  The draft warranty deeds provided a space for Rotonde to sign on
behalf of Pinnacle although the debtor concedes that the Pinnacle Operating Agreement
did not give Rotonde the authority to sign the deeds.

On June 27, 2008, Vuotto sent nine draft documents back to Carbone.  (<u>See</u> Ex.
7.)  Vuotto had changed the deeds to bargain and sale deeds, but left the signature line
unchanged.  Thus, Rotonde would still sign on behalf of Pinnacle.  Nick Racioppi, Esq.,
GDC's real estate lawyer, testified credibly that the signature block was not changed
because everything was to close simultaneously.  Under those circumstances, it did not
matter if Rotonde signed for Pinnacle.  In addition, Vuotto sent a draft note, mortgage
and indemnity agreement.  The transmittal email advised Carbone that the documents
were being sent prior to GDC's review to expedite the matter, and "[a]ccordingly, the
documents remain subject to our client's further review, comment and approval."  (<u>Id.</u>)

### 3.        The June 28th Email

On June 28, 2008, the arbitrator sent an email (the "6/28 Email") to both sides.

(See Ex. 9.)  After confirming his decision that Pinnacle should be dissolved, he

addressed the separate issues of control and ownership of the Property:

> As a second issue, your letter along with Mr. Ginsberg's questions
> whether enough evidence was heard for a proper determination that
> control of the Pinnacle's property be given to RMP and that all of the
> Pinnacle's property be conveyed to RMP.

(Id.)(Emphasis added.)  The arbitrator also observed that GDC reserved the right to assert

a claim for damages, and that if the debtor "agrees to maintain control of the property,

they are as well accepting this exposure should they fail to demonstrate how they have

been harmed."  The arbitrator's email concluded, "[i]f RMP [the debtor] advises they

wish to proceed with control of the property, then the contract is to be executed by both

parties as directed."  (Id.)

On June 30, 2008, Carbone emailed the arbitrator, informing him that the debtor

"agrees to maintain ownership of the property."  (Ex. I)(emphasis added.)

### 4.        The Impasse

The parties continued to negotiate over the terms of the documents.  On July 2,

2008, the debtor's counsel, Aaron Boyajian, Esq., returned marked up versions of the

draft note, mortgage and contract assignment prepared by GDC's counsel.  (See Ex. 11.)

He did not return the deeds.  Vuotto complained to the arbitrator about the debtor's

proposed changes on July 3, 2008, (see Ex. 12), and Carbone responded that same day

that GDC was attempting "to delay the transfer of the property to RMP," GDC was

attempting "to have the transfer of the properties delayed," "[u]nder no circumstances

should the conveyances of the properties be delayed until the conclusion of the damage

hearing," and "under no circumstances should the transfer of the property be delayed

until the conclusion of the damage hearings."  (Ex. 55.)

Vuotto wrote back to the arbitrator on July 7, 2008.  (See Ex. 13.)  He stated that

GDC was available for a conference call on July 9th.  Responding to Carbone's July 3rd

email, Vuotto said, "GDC is not adverse to conveying the property subject to a mortgage,

provided that it contains reasonable, industry standard protections."  (Id.)

On July 8, 2008, Carbone's secretary transmitted an email to the arbitrator.  (See

Ex. 14.)  Carbone amplified the debtor's objections to GDC's drafts, and enclosed the

redrafts that had previously been transmitted to GDC.  He stated that the debtor had no

comment on the deeds "as they have been accepted."  (Id. at 3 (Bates no. GDC00431).)

The impasse continued after the July 9th conference call with the arbitrator,[2] GDC

asked the arbitrator to intervene again, (Ex. 16), and another conference call was

scheduled for July 22nd.  During the latter call, which was transcribed, (see Ex. 19), the

parties again rehashed their objections to the proposed mortgages and other documents.

Both sides viewed the conveyance of the Property as something that had not yet occurred,

and depended on the delivery of the mortgages and other documents.  At one point,

Carbone stated that by delivering the mortgage and note, the debtor wanted to put GDC

in the same position it was in on June 18th, but "[t]he only thing that's changed, the

Arbitrator has ruled that the property is going to be transferred  to RNP [sic]."  (Ex. 19 at

6 (Bates no. GDC00465).)(Emphasis added.)  Racioppi mentioned that they were talking

---

[2]        Neither side introduced a written record of what transpired during the July 9th conference call.

about conveying the Property to the debtor, and needed to be protected.  (<u>Id.</u> at 16 (Bates

no. GDC00475).)  He added that the Property was owned by Pinnacle, but "[o]nce we

convey it to you, then it's a big difference.  (<u>Id.</u> at 44 (Bates no. GDC00503).)

**B.      The Secret Delivery and Recordation of the Deeds**

On or about July 31, 2008, GDC and its lawyers made a series of startling

discoveries.  The draft deeds that GDC sent on June 27th had been executed by Rotonde

as agent for Pinnacle on June 30th, delivered for recordation on July 21st, and recorded on

July 29th. (<u>See</u> Ex. 20.)  Irate, Vuotto wrote to the arbitrator on July 31, 2008, informing

him of what had occurred.  (<u>See</u> Ex. 22.)  Carbone responded the next day, arguing that

the transfer of the Property was consistent with the 6/18 Email, the 6/28 Email and the

Interim Award.  (<u>See</u> Ex. 23.)  In particular, the paragraphs of the Interim Award "are not

interrelated in that the transfer of the deeds is not contingent upon the execution of the

mortgage." (<u>Id.</u> at Bates no. GDC00562.)  According to Carbone, he negotiated the

language of the Interim Award with Vuotto, and "GDC could have suggested that such

language be included within the Interim Award, but it never did so." (<u>Id.</u>)

The arbitrator cut through the arguments, issuing a deadline to the debtor.  (<u>See</u>

Ex. 27.)  After resolving the disputed mortgage and other terms, the arbitrator directed

GDC to modify the documents by August 6th, and gave the debtor until August 12th to

return the signed documents and produce a letter of credit.

GDC sent the revised documents for signature on August 6th.  (<u>See</u> Ex. 31.)  Its

lawyers thereafter tried to contact the debtor's lawyers without success, (<u>see</u> Exs. 28-30),

and eventually complained to the arbitrator.  (<u>See</u> Ex. 31.)  The email to the arbitrator

elicited a response from Carbone.  He represented to the arbitrator that his firm was

reviewing the documents and working on the letter of credit.  (Ex. 32.)

On August 11th, the day before the deadline imposed by the arbitrator, the parties

exchanged several emails.  GDC's attorneys pressed the debtor's attorneys for the

documents, which they still had not received.  (See Exs. 33, 35.)  Boyajian responded that

the debtor's attorneys were still reviewing the documents.  (Ex. 34.)  GDC asked the

arbitrator to intervene, and complained that the debtor was delaying the closing.  (Ex. 36.)

After GDC communicated with the arbitrator, the debtor got back to GDC.  (See

Ex. 37.)  Boyajian stated that GDC had inserted language into the mortgage that was

neither agreed to nor ordered by the arbitrator.  The email listed numerous examples.

Finally, Carbone wrote to the arbitrator at 4:24 p.m., stating that his firm was working

with GDC in reviewing the documents, and he did not know why GDC was bothering the

arbitrator.  (Ex. 38.)

## C.     The Bankruptcy

The debtor did not make the deadline, and instead, filed a chapter 11 petition at

9:08 p.m., approximately four-and-one-half hours after Carbone sent the email to the

arbitrator.  GDC responded with a motion to dismiss the petition as a bad faith filing, or

alternatively, to appoint a chapter 11 trustee.  The common thread running through both

aspects of the motion was the impropriety of the transfer from Pinnacle to the debtor.

The Court ordered an evidentiary hearing into the circumstances surrounding the transfer.

After the first day of trial, the parties changed their positions.  The debtor fired its

original bankruptcy lawyer, Marc Stuart Goldberg, Esq., and retained Klestadt &

10

Winters, LLP, as substitute bankruptcy counsel.  The debtor also retained Jeffrey H.

Weinberger, Esq., as special counsel.  Klestadt & Winters filed papers consenting to the

dismissal of the case, and agreed to reconvey the Property to Pinnacle, although after the

dismissal.  Goldberg opposed the dismissal unless it provided for the payment of

approximately $125,000 in legal fees.

In another reversal, GDC declined the debtor's offer to dismiss the case, and

withdrew its request for dismissal.  It now pressed for the appointment of a chapter 11

trustee.  The Court refused to dismiss the case for the reasons stated on the record, and

held two more days of evidentiary hearing in connection with the remaining request to

appoint a trustee.

## DISCUSSION

Section 1104(a) of the Bankruptcy Code governs the appointment of a chapter 11

trustee.  It provides:

> (a)      At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the United
> States trustee, and after notice and a hearing, the court shall order the
> appointment of a trustee—

> (1)      for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current management,
> either before or after the commencement of the case, or similar cause, but
> not including the number of holders of securities of the debtor or the
> amount of assets or liabilities of the debtor;

> (2)      if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate, without regard to
> the number of holders of securities of the debtor or the amount of assets or
> liabilities of the debtor; or

> (3)      if grounds exist to convert or dismiss the case under section
> 1112, but the court determines that the appointment of a trustee or an
> examiner is in the best interests of creditors and the estate.

The appointment of a § 1104 trustee is an "extraordinary remedy." In re Euro-American Lodging Corp., 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007); In re Adelphia Commc'ns Corp., 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006), aff'd, 342 B.R. 122 (S.D.N.Y. 2006); In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990). The movant must prove the need for a trustee by clear and convincing evidence. In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989); Euro-American Lodging Corp., 365 B.R. at 426.

## A. Section 1104(a)(1)

Section 1104(a)(1) mandates the appointment of a chapter 11 trustee "for cause," a term that expressly includes, but is not limited to, "dishonesty." "Dishonesty" means "lack of honesty, probity, or integrity in principle **:** lack of fairness and straightforwardness **:** disposition to defraud, deceive, or betray." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 650 (1981). GDC demonstrated by clear and convincing evidence that the debtor, its principals and its attorneys acted dishonestly when they secretly transferred the Property from Pinnacle to the debtor, and then hid what they had done from GDC and the arbitrator.

### 1. The Transfer

Rotonde and Carbone knew that nothing that occurred on June 18th or June 19th authorized Rotonde to sign the deeds on behalf of Pinnacle and record them for the benefit of the debtor. Both placed heavy reliance on the 6/18 Email. The latter simply granted control of the Property to the debtor, but did not authorize the unconditional transfer of the Property. During the June 19th hearing, Liloia acknowledged that the debtor already had control, and insisted on a promise of indemnity from the debtor.

Meyer recognized that in order for the debtor to get title, it would have to give a mortgage now.  The parties confirmed that they still had to draft the conveyance documents and mortgages, and GDC's counsel agreed to take the laboring oar.[3]

Carbone's contrary testimony was incredible.  He knew that the 6/18 Email and the June 19th hearing did not allow the debtor to take immediate title to the Property, independent of the mortgages.  On July 3rd he wrote a two-page email to the arbitrator in which he accused GDC – four times – of trying to delay the conveyance of the Property by insisting on unreasonable mortgage terms.  If he believed that the debtor already had the right to convey the Property, he would not have accused GDC of holding up the conveyance.  He would not have bothered, for that matter, to send draft deeds on June 25th.  If Carbone thought that the arbitrator had already authorized the transfer, he would have simply had Rotonde sign and file the deeds, as Rotonde eventually did.  Carbone sent the draft deeds because he knew that they required GDC's approval.[4]

---

[3]      The arbitrator had ruled on June 28th that if the debtor chose to maintain control of the Property, both parties would have to sign "the contract."  (Ex. 9.)  Carbone testified that the "contract" referred to what eventually became the Interim Award, but there is no evidence to support this statement, and I do no find this credible.  The terms of the Interim Award may have been the subject of negotiation, but the arbitrator, not the parties, signed the award.  Instead, I find that "the contract" referred to the transactional documents that GDC's lawyers had volunteered to draft.

[4]      Even if the arbitrator had directed the transfer of the Property, Rotonde never had the authority to execute the deeds on behalf of Pinnacle.  The signature block on the deeds, which included a space for Rotonde to sign on Pinnacle's behalf, certainly did not convey that authority, and GDC's acquiescence in the signature block did not ratify Rotonde's authority.  GDC did not care if Rotonde signed the deeds, because the deeds and the mortgages, as well as the other documents, were going to be exchanged at the same time.  Moreover, Rotonde signed the deeds drafted by GDC that were sent with the warning that they were drafts, the client had not seen them and they were subject to change.

        The debtor implied that Rotonde's authority derived from the arbitrator's direction.  Yet the arbitrator also directed the debtor to sign and deliver mortgages and indemnity agreements.  Under the debtor's theory, the arbitrator's direction also authorized Ginsburg to sign the mortgages and indemnity agreements on the debtor's behalf.

Recognizing the limits of the 6/18 Email and the June 19th hearing, the debtor's professionals hatched a scheme – they would rely on an ambiguous award, then under negotiation but not yet signed, to justify the transfer of the Property.  Carol L. Dall, Esq., another of the debtor's attorneys, testified that the deeds were signed and put aside pending the issuance of the Interim Award.[5]  The Interim Award, issued on July 9, 2008, listed the various deal points in separate paragraphs, but did not link them.  The debtor intended to argue that this meant that the delivery of the deeds was independent of the delivery of the mortgages and other documents.  Carbone testified, with some self-satisfaction, that he purposely drafted the Interim Award not to expressly require the simultaneous execution of the documents.  He blamed GDC's lawyers for not insisting on a single closing and simultaneous delivery of all documents, declaring that if GDC wanted it, its lawyers knew how to express it.

This maneuver was ineffective to memorialize rulings that Carbone knew the arbitrator never made.  As noted, the Interim Award was silent; it did not say that all documents had to be exchanged simultaneously, but it also did not say that the deeds could be delivered without the simultaneous delivery of the documents that GDC was demanding.  Although Carbone blamed GDC's lawyers and suggested that they were inept, he conceded that he never raised this issue with GDC's lawyers.  Under the circumstances, GDC's lawyers would have no basis to believe that it even was an issue.

Furthermore, the Interim Award contradicted the debtor's contention that control and ownership of the Property was the same thing.  As noted, the 6/28 Email drew the

---

[5]    Dall's testimony further undercuts the debtor's position that the 6/18 Email and June 19th hearing authorized the conveyance of the Property.

distinction.  The Interim Award did too.  Paragraph 7 required the debtor to indemnify Pinnacle, GDC and Ginsburg, <u>inter alia</u>, for any liability arising from the debtor's actions to develop the Property "after the date of the transfer or <u>arising from RMP's actions prior to the date of the transfer</u>."  (Ex. 15 at 3 (Bates no. GDC00455).)(Emphasis added.)  If the debtor were correct, there would be no reason to indemnify GDC for liability arising from the debtor's actions to develop the Property "prior to the date of the transfer."  In other words, the debtor controlled the Property and could take steps to develop it even though Pinnacle still owned it.[6]

In short, everyone understood prior to July 9th that the deeds and the mortgages (and other documents) had to be exchanged simultaneously.  The terms of the Interim Award did not authorize the unilateral execution and recordation of the deeds, and the debtor's undisclosed intent or understanding is immaterial to its interpretation.

## 2.      The Secrecy and the Cover Up

The more troublesome aspect of this case relates to the secrecy and lack of candor shown by the debtor and its professionals.  Rotonde executed the deeds without authority, and then hid what he had done from GDC.  After the arbitrator issued the Interim Award, Rotonde delivered the deeds to Dall for recordation, again without telling GDC.  Dall eventually delivered the deeds to the county clerk for recordation, but failed to disclose this to GDC.  The county clerk filed the deeds, but as before, no one informed GDC.  Yet during this same period, the parties continued to negotiate the terms of the mortgage and

---

[6]      Several of the debtor's witnesses testified that the debtor could not develop the Property unless it had title.  This provided yet another justification for the execution of the deeds.  Assuming that title was necessary, the award of control did not provide Rotonde with the authority to execute and record the draft deeds.

the other documents and participate in hearings with the arbitrator. Carbone admitted

that he never "volunteered" to Vuotto that the deeds had been delivered. Nor did he or

Rotonde ever mention, until GDC's title insurer made the discovery, that Rotonde had

executed the deeds on behalf of Pinnacle and delivered them to himself on behalf of the

debtor, or that the debtor had recorded the deeds.

In fact, they created the opposite impression. For example, on July 8th, Carbone

wrote to the arbitrator, criticizing the unreasonable mortgage terms demanded by GDC.

He added at the very end of his email that the debtor had no comments on the deeds as

they had been "accepted." (Ex. 14 at 3 (Bates no. GDC00431).) Carbone implied during

his testimony that this statement was meant to signify that the signed deeds had been

delivered to the debtor, and the debtor had "accepted" them. It did not mean, as the

context of the email indicated, that the form of the deeds was acceptable.

Carbone also implied during the July 22nd conference that no transfer had

occurred. He declared that the arbitrator had ruled that the Property "is going to be

transferred to RNP [sic]." (Ex. 19 at 6 (Bates no. GDC00465).) He did not inform the

arbitrator or GDC that it had already been transferred on June 30th when Rotonde signed

and delivered the deeds to himself. Nor did he correct Racioppi who referred to the

conveyance as a future event dependent on the delivery of a satisfactory mortgage and

other documents.

It appears in this regard that the scheduling of the conference played a role in the

recordation of the deeds. Dall testified that she received the deeds from Rotonde on July

11th. She delivered them for recordation ten days later, one day before the scheduled

16

conference call.  She attempted to minimize the delay – she was tied up with other matters – but her testimony was unconvincing.  The debtor's witnesses testified that the debtor was anxious to acquire title in order to develop the Property as soon as possible.  If true, Dall would have delivered the deeds for recordation on Monday, July 14th.  Instead, she waited a full week, and finally acted the day before the scheduled conference call.  The circumstances suggest that the debtor was not as confident about its interpretation of the Interim Award as it was at trial, and acted out of concern that the arbitrator might change his ruling or impose new requirements during the conference call.  In any event, the debtor never satisfactorily explained the delay in recordation in light of the supposed urgency.

On August 4th, after the truth came out, the arbitrator gave the debtor eight days to execute the documents that the parties had been exchanging for over one month.  Carbone did not respond to the debtor's communications until GDC contacted the arbitrator.  Thereafter, on August 11th, only four-and-one-half hours before filing bankruptcy, Carbone represented to the arbitrator that it was reviewing the documents, and questioned why GDC was wasting the arbitrator's time.

Carbone's August 11th statement that GDC should not be bothering the arbitrator was an odd criticism given that the debtor was planning to do precisely that.  On Friday, August 8, 2008, Carbone or another lawyer in his office had drafted a letter asking the arbitrator to reconsider his directions to deliver the mortgage, personal guarantees and letter of credit.[7]  (Ex. Q.)  It is worth noting that the draft letter did not complain that the

---

[7]      Carbone's office had also drafted an order to show cause for submission to the state court, confirming those paragraphs of the Interim Award that benefited the debtor (the transfer of the Property

arbitrator had not given the debtor enough time to procure a letter of credit, an argument

that the debtor made during trial.  Instead, the letter stated that the debtor did not have the

independent credit ability or income producing assets to obtain the letter of credit.  It does

not appear that the letter was sent.

About the same time, the debtor began to focus on a possible bankruptcy.  On

August 7th, Rotonde, Meyer, Dall and Weinberger discussed the option.  (See Ex. 63.)

Dall also testified that she had spoken to the debtor's original bankruptcy lawyer

(Goldberg), a few days before the August 11, 2008 petition date.  In fact, the debtor filed

for bankruptcy four-and-one-half hours after sending the arbitrator an email stating that

the parties were working on the documents, and implying that GDC should stop

bothering the arbitrator.  This final communication to the arbitrator appears to have been

little more than a stall tactic.

Based on the foregoing, I find that the debtor, its principal, Rotonde, and its

lawyer, Carbone, acted dishonestly when they caused Pinnacle to transfer the Property

secretly to the debtor, knowing that the delivery of a mortgage and other protections to

GDC was a quid pro quo for the conveyance and that Rotonde lacked the authority to

execute the deeds drafted by GDC as the agent for Pinnacle.  They also acted with deceit

when they failed to disclose the delivery or recordation of the deeds until GDC

---

and the assignment of certain contract rights), vacating the paragraph in the Interim Award that required the
delivery of the $14.629 million mortgage, and vacating the portions of the August 4th directive that required
personal guarantees from Rotonde and Meyer and a letter of credit.  (Ex. R.)  Carbone's office never
submitted the order to show cause.

discovered what had occurred, and instead, stated or implied to the arbitrator and GDC's lawyers that the conveyance had not yet occurred.[8]

Rotonde's conduct is exacerbated by the position of trust he abused. He was a member of the management committee of Pinnacle, and owed the same duties that a director of a corporation owes to the corporation and the shareholders. O'Connell v. Shallo (In re Die Fliedermaus LLC), 323 B.R. 101, 110 (Bankr. S.D.N.Y. 2005); see N.Y. LTD. LIAB. CO. § 409 ("A manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances."). Consequently, he owed fiduciary duties to Pinnacle and GDC, Out of the Box Promotions, LLC v. Koschitzki, 2008 WL 4491677, at *2 (N.Y. App. Div. Oct. 7, 2008), and breached those duties by secretly transferring Pinnacle's assets to RDC. Nathanson v. Nathanson, 799 N.Y.S.2d 83, 84-85 (N.Y. App. Div. 2005)(holding that allegations of self-dealing by a manager of an LLC were sufficient to state a cause of action for breach of fiduciary duty). Making matters worse, the debtor had sold the Jomas Lot to Pinnacle, which had assumed a $3.5 million mortgage and paid the debtor over $3 million in cash. At the end of the day, Rotonde kept the cash and took the Jomas Lot back, without compensating Pinnacle. Under the circumstances, the appointment of a trustee is mandated under 11 U.S.C. § 1104(a)(1).

---

[8]    I do not find that Dall acted deceitfully. She did not participate personally in the arbitration or most of the communications between the two sides, and apparently received her understanding of the situation from Carbone and Rotonde.

**B.      Section 1104(a)(2)**

GDC has also demonstrated that the appointment of a trustee is in the interests of

the creditors and the estate within the meaning of § 1104(a)(2).  In determining whether a

trustee should be appointed under section 1104(a)(2), "in the interests of creditors,"

courts "look to the practical realities and necessities."  <u>Ionosphere Clubs, Inc.</u>, 113 B.R.

at 168 (citation omitted).  Although decisions have articulated certain factors to guide the

court, <u>see</u> <u>id.</u> ("Among the factors considered are (i) the trustworthiness of the debtor; (ii)

the debtor in possession's past and present performance and prospects for the debtor's

rehabilitation; (iii) the confidence – or lack thereof – of the business community and of

creditors in present management; and (iv) the benefits derived by the appointment of a

trustee, balanced against the cost of the appointment.")(citations omitted), the standard is

a flexible one.  <u>Sharon Steel Corp.</u>, 871 F.2d at 1226; <u>Ionosphere Clubs, Inc.</u>, 113 B.R. at

168; <u>In re V. Savino Oil & Heating Co., Inc.</u>, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y.

1989)("[T]he factors constituting a basis for appointing a trustee under § 1104(a)(2) are

amorphous, diverse, and necessarily involve a great deal of judicial discretion.").  Unlike

§ 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a

trustee even if no "cause" exists.  <u>In re Marvel Entm't Group, Inc.</u>, 140 F.3d 463, 474 (3d

Cir. 1998); <u>Sharon Steel Corp.</u>, 871 F.2d at 1226; <u>Ionosphere Clubs, Inc.</u>, 113 B.R. at

168.  The Court has broad discretion, <u>Sharon Steel, Corp.</u>, 871 F.2d at 1226, and at

bottom, "it seems that § 1104(a)(2) reflects 'the practical reality that a trustee is needed.'"

<u>V. Savino Oil & Heating Co., Inc.</u>, 99 B.R. at 527 n.11 (quoting <u>Sharon Steel Corp.</u>, 86

B.R. 455, 458 (Bankr. W.D. Pa.1988)).

A chapter 11 debtor and its managers owe fiduciary duties to the estate.  Hirsch v.
Penn. Textile Corp., Inc. (In re Centennial Textiles, Inc.), 227 B.R. 606, 612 (S.D.N.Y.
1998).  An independent trustee should be appointed under § 1104(a)(2) when they suffer
from material conflicts of interest, and cannot be counted on to conduct independent
investigations of questionable transactions in which they were involved.  E.g., In re PRS
Ins. Group, Inc., 274 B.R. 381, 389 (Bankr. D. Del. 2001)(appointment of trustee
appropriate under § 1104(a)(2) where causes of action against insiders are a significant
asset of this estate and there are no business operations requiring current management);
In re Microwave Prods. of Am., Inc., 102 B.R. 666, 676 (Bankr. W.D. Tenn.
1989)(chapter 11 trustee appointed where debtor was not in a "strong posture" to pursue
possible claims due to conflicts of interest and fraudulent transfers, and "a trustee would
likely be able to investigate claims that could result in additional sums of money coming
into the estate"); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. W. Va.
1980)(appointing trustee under § 1104(a)(2) where "[t]he magnitude of the number of
inter-company transactions places current management of [the debtor] in a position of
having grave potential conflicts of interest and the presumption arises that the current
management of [the debtor] will be unable to make the impartial investigations and
decisions demanded in evaluating and pursuing inter-company claims on behalf of [the
debtor].").

For the reasons already discussed, I find that Rotonde is not a trustworthy
fiduciary.  In addition to his participation in the transfer of the Property and subsequent
cover-up, two other aspects of this case gave me pause.  During cross-examination, he
said that the 6/18 Email awarded the Property to the debtor, and the June 19th discussions

and everything else that followed was "irrelevant" to the debtor's right to the Property. His response signaled an unwillingness or inability to understand proceedings or abide by court orders with which he disagrees.

In addition, Rotonde oversaw the transfer of the majority of the debtor's cash during the year preceding the petition when the debtor was not even operating and its only asset was its interest in Pinnacle. Pinnacle acquired the Jomas Lot from the debtor in March 2006. As noted, Pinnacle paid the debtor approximately $3 million in cash, and the debtor still held the cash proceeds as of October 2007. During the next 11 months, the debtor paid $811,383.90 to RDC, including approximately $300,000 on August 8, 2008, and $250,000 on the petition date. (See Ex. 40 at Bates no. GDC00604[9]; Ex. 49 at Bates no. GDC00706; Ex. 54 at Bates no. GDC00763.) Rotonde testified that everything but the last $250,000 was intended to reimburse RDC for services to the debtor, although no reimbursement agreement existed. Rotonde also testified that the $250,000 payment was intended to assist the debtor in obtaining a letter of credit, and was returned after the petition was filed.[10] In addition, the debtor paid Rotonde $85,500.00, (Ex. 54 at Bates no. GDC 00763), but these payments were not listed in the SOFA. (See Ex. 40 at Response to Q. 3(c).)

---

[9]     It is not clear that Exhibit 40, the Statement of Financial Affairs ("SOFA"), was offered or received in evidence. The Court can nevertheless take judicial notice of the SOFA, which the debtor filed with the Court. Furthermore, Rotonde was questioned at length about the transactions reported in the SOFA.

[10]    The debtor paid WA $700,000 on the petition date, again supposedly to assist the debtor in procuring a letter of credit, but WA returned the payment post-petition. These transfers, although returned post-petition, raise questions about Rotonde's honesty. During the trial, Rotonde testified that Meyer owned 24 hotels, and implied that he could get a letter of credit based on his own credit. Furthermore, if the debtor was having trouble raising the cash to back a letter of credit, it made no sense to split the $950,000 between Meyer and Rotonde; either Meyer or Rotonde should have received all of the funds to use for the procurement of the letter of credit.

Finally, though not technically an insider, Rotonde's fiancée, Heidi Brown,
received $55,141.97, including $10,900 on the petition date. (See Ex. 49 at Bates no.
GDC00706.) Brown testified that she was employed at $50 per hour to provide
bookkeeping services. At the time of the pre-petition transfers, the debtor's only asset
was its interest in Pinnacle, and its only activity was its participation in the arbitration. I
cannot expect Rotonde to investigate, and if appropriate, sue to recover these transfers.[11]

Accordingly, I conclude that GDC has demonstrated that the appointment of a
chapter 11 trustee is in the best interests of the creditors and the estate. I recognize that
equity, ultimately Rotonde and Meyer, prefer dismissal to a chapter 11, and if the case
remains in chapter 11, they prefer that the debtor be "in possession," not out of it. Their
preference is understandable since they, or at least Rotonde, may be the target of a
trustee's investigation. Nevertheless, Rotonde has proven himself untrustworthy, and an
independent trustee better serves the interests of the constituencies that come ahead of
equity.

The debtor's belated desire for dismissal of the case it commenced merits a final
comment. The debtor has proposed to return the parties to the status quo ante by
reconveying the Property to Pinnacle at some time after dismissal. (Proposed Order
Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Case at 2)(ECF Doc. #
37.) The debtor's counsel has also proposed to pay all of the debtor's undisputed
creditors, an empty offer. The debtor scheduled seven unsecured creditors, and the offer
of payment would benefit only Carbone's law firm, Goetz & Fitzpatrick, which is owed

---

[11]     The debtor also made questionable payments post-petition. Rotonde paid RDC $25,000,
apparently for managing the debtor. Dall testified that she received $2,500.00 even though she has not
been retained as the debtor's counsel under 11 U.S.C. § 327.

$208,263.00, and RDC, which is owed $250,000.00.  The offer would exclude the

debtor's other five creditors, including GDC, scheduled at $14,629,000, and Wachovia

Bank, listed at $3.4 million.

The dismissal proposal also ignores Goldberg's limited objection relating to the

payment of a substantial legal fee that he has asserted.  The debtor's papers imply that

Goldberg committed malpractice, and will presumably oppose payment of the fee he

seeks.  The Court may have to determine this issue.

Lastly, GDC has moved for sanctions, which the debtor's dismissal proposal

would deny.  (Id. at 2.)  The debtor nevertheless expressed a willingness to pay GDC's

"reasonable" legal fees and expenses in exchange for a dismissal, and judging from what

I have seen, GDC has incurred substantial legal fees and expenses prosecuting its

motions.  I doubt that they will agree on what is "reasonable," and I may ultimately have

to decide this issue.  In short, a great deal has occurred as a result of the filing of this

case, and the debtor's proposed dismissal does not return the other parties to the status

quo ante.

In conclusion, the motion to appoint a chapter 11 trustee is granted.  The United

States Trustee is directed to appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104(d),

and seek approval of the appointment in accordance with Interim Federal Bankruptcy

Rule 2007.1.  The foregoing constitutes the Court's findings of fact and conclusions of

law.

      So ordered.

Dated: New York, New York
        November 12, 2008

            /s/  *Stuart M. Bernstein*
            STUART M. BERNSTEIN
        Chief United States Bankruptcy Judge