UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

In re:                                      :
                                            :
RIDGEMOUR MEYER PROPERTIES, LLC,            :           Chapter 11
                                            :           Case No. 08-13153 (SMB)
                        Debtor.             :
---------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT AND
## CONCLUSIONS OF LAW REGARDING CLAIM NO. 5

**A P P E A R A N C E S :**

GOETZ FITZPATRICK LLP
One Penn Plaza, 31st Floor
New York, New York 10119

    Gary M. Kushner, Esq.
    Scott D. Simon, Esq.
        Of Counsel

*Creditor Pro Se*

JOSEPH T. ADRAGNA, ESQ.
58 East Main Street
Huntington, New York 11743

*Attorney for Debtor*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

    This prolonged dispute concerns the allowance of the proof of claim no. 5 (the

"Claim") filed by Goetz Fitzpatrick LLP ("GF" or "Goetz Fitzpatrick").  GF represented

the debtor ("Ridgemour" or the "Debtor") in prepetition litigation which has already

been the subject of a motion to appoint a chapter 11 trustee in this Court and

professional malpractice litigation in state court.  The Claim was originally filed in the

amount of $350,555.49, but has been reduced by agreement to $310,104.21 to eliminate

post-petition charges as GF was never retained in this chapter 11 case.  The Claim

incorporates disbursements, including Westlaw research charges, which are discussed

separately later in this opinion.  Having conducted a four day evidentiary hearing, I now

conclude that the Claim should be allowed in the amount of $259,606.71, and in

accordance with the confirmed Plan, direct the Debtor to promptly pay the allowed

amount of the Claim plus post-petition interest at the annual rate of 2.22%.

## FINDINGS OF FACT[1]

The background to the parties' dispute is discussed at length in *In re Ridgemour*

*Meyer Props., LLC*, 413 B.R. 101 (Bankr. S.D.N.Y. 2008) ("*Ridgemour I*"), *Metro. Plaza*

*WP, LLC v. Goetz Fitzpatrick, LLP*, No. 115519/2009, 2013 N.Y. Misc. LEXIS 4466,

2013 NY Slip Op 32368(U) (N.Y. Sup. Oct. 7, 2013) ("*Ridgemour II*"), *aff'd*, 3 N.Y.S.3d

595 (N.Y. App. Div.), leave to appeal denied, 43 N.E.3d 375 (N.Y. 2015) and *In re*

*Ridgemour Meyer Props., LLC*, Case No. 08-13153 (SMB), 2016 WL 5395836 (Bankr.

S.D.N.Y. Sept. 27, 2016 ("*Ridgemour III*").  Additional evidence relevant to the dispute

was received at trial.

Ridgemour is a New York limited liability company whose members are owned

and controlled by William Meyer ("Meyer") and A.J. Rotonde ("Rotonde").  In 2003,

Ridgemour and Ginsburg Development Companies, LLC ("GDC") formed a joint

venture, known as Pinnacle-Westchester LLC ("Pinnacle"), to develop and erect a high

rise building in White Plains, New York.  Ridgemour contributed a parcel of real

property known as the "Primary Lot" which was subject to a mortgage in the

---

[1]    The following conventions are used in this opinion:  "GFX" refers to GF's trial exhibits, "RX" refers
to Ridgemour's trial exhibits, and "Tr." followed by a parenthetical date refers to the hearing transcript for
that day.  Finally, "ECF Doc. #" refers to the electronic docket in this case.

approximate amount of $3,386,000 held by Merida Associates, Inc. ("Merida") and contract rights to purchase two other lots. Ridgemour subsequently sold another lot (the "Jomas Lot") to Pinnacle. Unless otherwise indicated, Property refers to all of the Pinnacle real property that originated with Ridgemour.

By 2006, if not sooner, Ridgemour and GDC became deadlocked over the future of Pinnacle. Ridgemour still hoped to develop the project while GDC sought to dissolve the joint venture. On November 22, 2006, GDC commenced an arbitration against Ridgemour, Meyer and Rotonde (the "Arbitration"). Ridgemour originally hired a different firm to represent its interests, but eventually retained GF. Donald Carbone, Esq., a GF partner, was in charge of the legal work performed by GF on behalf of Ridgemour.

The retainer was memorialized in a Letter Agreement, dated Sept. 10, 2007 (the "Retainer"). (GFX 1.) In relevant part, it initially stated that Ridgemour retained GF to represent Ridgemour in connection with the Arbitration and a related state court action brought by Ridgemour against GDC and its principal, "as well as any other matter you give us to handle." The names of Rotonde and Meyer, who were also parties to the Arbitration, were interlineated by hand to identify them along with Ridgemour as the "Client." Rotonde and Carbone initialed the handwritten interlineation, but Meyer did not. The Retainer also included an agreement to pay a $35,000 retainer and subsequently billed fees as well as costs and expenses "including, for example, long distance telephone, overnight mail and messenger services and court fees." It stated that Carbone was in charge of the matter and billed at the hourly rate of $425.00, but GF could assign other attorneys and paralegals to work on the matter based on cost

3

efficiency, expertise or unavailability.  Finally, the Retainer enclosed a list of GF's attorneys and paralegals and their billing rates, but "reserved the right to change its hourly rate from time to time" and the new rate would apply to subsequent work.

## A.    The Arbitration

As described more fully below, the factual and legal issues relating to the Arbitration, and hence, the majority of the services required by GF, were complex and time-consuming, and involved twelve days of hearings before Arbitrator Scarola (the "Arbitrator").  Ellen August, a litigation partner at GF and a particular target of Ridgemour's fee objection, assisted Carbone and also attended the hearings as a "second seat."

The Arbitrator initially decided in a series of interim rulings that the evidence did not justify proceeding with the project, Pinnacle would be dissolved, ownership of the Property would be transferred back to Ridgemour and, *inter alia,* Ridgemour would execute a note and mortgage on the Property in the sum of $14.629 million to secure the repayment of sums that might be determined at a later date to be due to GDC on account of amounts invested or expended in Pinnacle.  Ridgemour also had to agree to indemnify Pinnacle, GDC and Ginsburg from any liability arising from its efforts to develop the Property after the date of the transfer or arising from Ridgemour's actions prior to the date of the transfer.  Ridgemour was "elated" and "delighted" with the Arbitrator's ruling directing return of the Property back to Ridgemour.  (GFX 14 (*Declaration of William A. Meyer in Support of Opposition to the Motion of Ginsburg Development Companies, LLC Seeking Entry of an Order Dismissing Debtor's Chapter 11 Bankruptcy Case or, Alternatively, for the Appointment of a Chapter 11 Trustee and*

*for Sanctions*, dated Sept. 18, 2008), at ¶ 10); GFX 13 (*Declaration of A.J. Rotonde in Support of Opposition to the Motion of Ginsburg Development Companies, LLC Seeking Entry of an Order Dismissing Debtor's Chapter 11 Bankruptcy Case or, Alternatively, for the Appointment of a Chapter 11 Trustee and for Sanctions*, dated Sept. 18, 2008), at ¶ 8).)

GDC's lawyers and Carbone and his staff began preparing and exchanging draft documents, including deeds drafted by Carbone that reconveyed the Property from Pinnacle to Ridgemour, and a note, a mortgage and an indemnity agreement drafted by GDC's lawyers that provided security to GDC. The draft deeds contained a line for Rotonde to sign on behalf of Pinnacle. Although the Pinnacle Operating Agreement did not authorize Rotonde to sign the deeds, GDC did not change the signature block because everything was supposed to close simultaneously, and it did not matter to GDC that Rotonde signed the deeds.

The parties could not reach agreement on all of the documents. Nevertheless, on or about June 30, 2008, and without GDC's knowledge, Rotonde signed the deeds and delivered them to his real estate lawyer, Carol Dall, Esq., for recordation. The deeds remained in Dall's possession until July 21, 2008, when she personally delivered them to the County Clerk's Office for recording. They were recorded on July 29, 2008. During July, while the parties continued to negotiate over the documents and communicated with the Arbitrator, Carbone never informed the Arbitrator or GDC that the deeds had been executed and delivered for recordation, although he claimed at trial that he did not learn this until July 22, 2008, the day after Dall delivered the deeds for recordation. (*See* Tr. (8/9/17) at 34:8-35:8 (testifying regarding RX G).)

5

Upon discovering the recordation on or about July 31, 2008, GDC wrote to the Arbitrator informing him what had occurred. Carbone responded the next day that the provisions of the Arbitrator's Interim Award, dated July 9, 2008 (RX P), which had memorialized his rulings, did not make the delivery of the deed and the mortgage interrelated, and blamed GDC's counsel for not insisting on language that made them so. On August 4, 2008, the Arbitrator, siding with GDC, now also required Ridgemour to secure a $3.5 million letter of credit for the benefit of the Wachovia Bank and required Rotonde and Meyer to personally guaranty the GDC mortgage. (GFX 12 (*Debtor's Opposition to the Motion of Ginsburg Development Companies, LLC Seeking Entry of an Order Dismissing Debtor's Chapter 11 Bankruptcy Case or, Alternatively, for the Appointment of a Chapter 11 Trustee, and for Sanctions*, dated Sept. 18, 2008), at ¶ 15.) The Arbitrator directed GDC to modify the documents by August 6, 2008, and gave Ridgemour until August 12, 2008, to sign them but according to Ridgemour "[i]t was impossible to comply by August 12th." (GFX 14, at ¶ 15.) Furthermore, in addition to the Arbitration, GDC had commenced a lawsuit on August 8, 2008 seeking to compel the transfer of the Property back to Pinnacle, and had filed a *lis pendens* against the Property. (GFX 14, at ¶ 16.) By then, Ridgemour was involved in litigation with GDC in four different forums, the mortgagee on the Primary Lot (*i.e.*, Merida) had sought a declaratory judgment that the mortgage was in default and Ridgemour had already spent $1.5 million in legal fees and expenses. (GFX 14, at ¶ 17.)

## B.    The Bankruptcy Case

On August 11, 2008, "[i]n order for the Debtor to regroup, to be able to stop the unmitigated waste of precious time and money, it had no choice but to file the instant

6

petition in bankruptcy."  (GFX 14, at ¶ 17.)

GDC quickly moved for dismissal, or alternatively, the appointment of a chapter 11 trustee and for sanctions (the "Trustee Motion").  One of the grounds raised by GDC was Ridgemour's failure to comply with Local Bankruptcy Rule 1007, which required the debtor to file an affidavit detailing, among other things, the identity of the twenty largest unsecured creditors, including whether their claims are contingent, disputed or unliquidated.  (GFX 12 (*Debtor's Opposition to the Motion of Ginsburg Development Companies, LLC Seeking Entry of an Order Dismissing Debtor's Chapter 11 Bankruptcy Case or, Alternatively, for the Appointment of a Chapter 11 Trustee, and for Sanctions*, dated Sept. 18, 2008), at ¶¶ 63, 137 (quoting Local Bankruptcy Rule 1007-2).)  In response, Ridgemour contended that that the *Local Bankruptcy Rule 1007 Affidavit* that it filed on the Petition date was accurate.  (*Id.* at ¶ 138.)  Notably, Ridgemour's *Local Bankruptcy Rule 1007 Affidavit*, sworn to by Rotonde, listed GF's unsecured claim in the amount of $208,263.00, and did not indicate that GF's claim was disputed, contingent or unliquidated.  (ECF Doc. # 1-2.)  Ridgemour echoed this view of GF's claim when it filed its bankruptcy schedules on August 25, 2008.  Once again, it scheduled Goetz Fitzpatrick as a creditor holding an undisputed, unsecured claim in the amount of $208,263.00.  (GFX 7, at ECF pp. 12 of 15.)[2]

GDC eventually withdrew its request for dismissal of the case, and pressed for the appointment of a chapter 11 trustee.  After a multi-day evidentiary hearing that included testimony from Carbone and Rotonde, and as described more fully in *Ridgemour I*, the

---

[2]    "ECF pp." refers to the page numbers imprinted by the Court's CM/ECF system at the top of each page.

Court found that Carbone and Rotonde had engaged in unauthorized and dishonest acts during the arbitration relating, *inter alia*, to the execution and recordation of a deed by which Pinnacle retransferred the Property to the Debtor and the subsequent cover up of their actions.  Specifically,

> the debtor, its principal, Rotonde, and its lawyer, Carbone, acted dishonestly when they caused Pinnacle to transfer the Property secretly to the debtor, knowing that the delivery of a mortgage and other protections to GDC was a *quid pro quo* for the conveyance and that Rotonde lacked the authority to execute the deeds drafted by GDC as the agent for Pinnacle.  They also acted with deceit when they failed to disclose the delivery or recordation of the deeds until GDC discovered what had occurred, and instead, stated or implied to the arbitrator and GDC's lawyers that the conveyance had not yet occurred.

*Ridgemour I*, 413 B.R. at 112.  In addition, Rotonde breached his fiduciary duties to Pinnacle and GDC, Ridgemour's co-venturer, by secretly transferring the Property to Ridgemour, including a parcel that Ridgemour had sold to Pinnacle for approximately $3.4 million in cash and the assumption by Pinnacle of a $3.5 million mortgage.  *Id.* at 104, 112.  Based on these findings, the Court appointed a chapter 11 trustee.

The Court subsequently confirmed a plan (the "Plan") proposed by Meyer, WPD Development Corporation ("WPD"), Rotonde and W&A Development, LLC (collectively, the "Plan Proponents") on October 5, 2009.  The Plan provided, in relevant part, that the unsecured creditors (Class 5) would receive 100% of the allowed amount of their claims plus post-petition interest at the annual rate of 2.22% until paid.  (*Proponents' Fourth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated Aug. 21, 2009, at 19 (ECF Doc. # 220).)

## C.    The State Court Litigation

The confirmation did not resolve the issues between the parties.  On November 3,

8

2009, and in light of the Court's findings regarding the conduct of Goetz Fitzpatrick described in *Ridgemour I*, Ridgemour Development Corporation, the Debtor and the Plan Proponents other than WPD filed a complaint against GF and Carbone in the Supreme Court of the State of New York for New York County (the "Malpractice Action"). The complaint asserted claims for malpractice, breach of contract and fiduciary duties and violations of Section 487 of the New York Judiciary Law. The claims arose primarily from the defendants' misconduct during the Arbitration relating to the secret recordation of the deeds and the cover up.

On the next day, the Plan Proponents objected to the Claim (the "Claim Objection"). They asserted that the Claim was not entitled to the presumption of *prima facie* validity because Goetz Fitzpatrick had not provided invoices or other evidence of the claim, (GFX 10, at 3-4), the objection to the pre-Petition Date services should be deferred pending resolution of the Malpractice Action because the pre-Petition Date Services were linked to the Malpractice Action claims, (GFX 10, at 4-5), and the fees and expenses attributable to post-Petition Date services should be disallowed because Goetz Fitzpatrick was never retained in the bankruptcy case. (GFX 10, at 8-9.) The Claim Objection did not contend that the services were unreasonable or unnecessary with the possible exception of the conduct criticized by the Court in *Ridgemour I.*

The parties resolved two of the issues through a stipulation. They agreed that the Claim would be reduced by $40,451.28, representing the post-Petition Date legal fees and expenses, leaving a remaining claim of $310,104.21, which will continue to be referred to as the Claim. In addition, the stipulation adjourned the Claim Objection pending the resolution of the Malpractice Action. The Court closed the bankruptcy case

9

but expressly retained jurisdiction over the stayed Claim Objection.  *Ridgemour III*, 2016 WL 5395836, at *3.

On October 7, 2013, the state court granted GF's motion for summary judgment dismissing the Malpractice Action.  *See Ridgemour II*.  GF argued that if Carbone, a nonparty to the Trustee Motion, was deemed to have acted improperly in connection with the Arbitration, Ridgemour and Rotonde had too, and as parties to the Trustee Motion, were bound by this Court's determination.  *Ridgemour II*, 2013 N.Y. Misc. LEXIS 4466, at *14.

The state court agreed.  In addition to this Court's findings made in connection with the Trustee Motion, the state court cited additional evidence.  Although it rejected Rotonde's contention that he signed and filed the deeds based solely on Carbone's advice, the state court found that "there is ample circumstantial evidence which shows that Rotonde and Carbone were participants in the fraudulent scheme," *id.* at *19, and "Rotonde actively worked with Carbone (and others) and knowingly participated in the deceitful scheme, despite his assertion that he was only following Carbone's advice." *Id.* at *20.  Accordingly, the doctrines of collateral estoppel and *in pari delicto* barred the plaintiffs' claims.  *Id.* at *16-25.  The Appellate Division affirmed, 3 N.Y.S.3d 595, and the New York Court of Appeals denied the plaintiffs' motion for leave to appeal.  43 N.E.3d 375.

## D.    The Claim Objection

Following the completion of the state court litigation, GF returned to this Court and moved to reopen the bankruptcy case and compel the Debtor to pay the Claim in

accordance with the Plan. GF argued that *res judicata* and the *Rooker-Feldman* doctrine barred any further objections to the payment of the claim. In opposition, the Debtor raised its own *res judicata* argument and maintained that the Claim was not *prima facie* valid because it did not attach time records.

The Court reopened the bankruptcy case, and denied GF's motion on September 27, 2016. It rejected the parties' arguments that *res judicata* was applicable, *Ridgemour III*, 2016 WL 5395836, at *4-5, and that the *Rooker-Feldman* doctrine precluded consideration of the Claim Objection and mandated immediate payment of the Claim. *Id.* at *5. The Court also ruled that the failure to attach time records to the Claim did not affect the *prima facie* validity of the proof of claim or require its disallowance. The Claim was not based on the time records; the time records were evidence of the amount of the Claim. *Id.* Accordingly, a trial was necessary to resolve the Claim Objection.

What followed was a series of conferences, hearings and motions during which Ridgemour's theory of the Claim Objection, and specifically, the extent to which the doctrine of *in pari delicto* applied to defeat the Claim, changed with dizzying frequency. At a conference held on November 1, 2016, Debtor's counsel specifically advised the Court that it challenged approximately $43,000 in fees based on *in pari delicto*:

> THE COURT:      But first, I thought you said they weren't entitled to any fees under *in pari delicto*. Now, you're saying that they're not entitled to an amount which I'm being told is about $43,000.
>
> MR. ADRAGNA:    Well, What I'm saying is that when the deed was filed –
>
> THE COURT:      Look, are you contend – they're seeking something like $300,000. Are you contending that because of *in pari delicto*, they're not entitled to anything?
>
> MR. ADRAGNA:    No.

| THE COURT: | Okay. You're contending then they're not entitled to the fees that accrued after whatever that date was in July. I'm being told that's $43,000 or something like that. Have you checked how much that is? |
|---|---|
| MR. ADRAGNA: | It's approximately $43,000. That's from memory, but yes, I have checked. |

(Transcript of Hr'g held Nov. 1, 2016, at 5:18-6:8 (ECF Doc. # 312.)[3]

The Debtor took what appeared to be a consistent position in its *Answers to Goetz Fitzpatrick's First Set of Interrogatories*, dated Nov. 26, 2016 (GFX 5.) It stated in bold-faced, underlined, all capital letters that the Pinnacle deeds were dishonestly filed on July 30, 2008, and all billings by GF after that date "are cloaked with in pari delecto [*sic*] and [Ridgemour] is not chargeable with GF dishonesty." (GFX 5, at 7.)

The Debtor subsequently expanded the reach of the *in pari delicto* disqualification. On May 15, 2017, it filed a motion to disallow the entire Claim based on *in pari delicto*. (ECF Doc. # 318.) Goetz Fitzpatrick filed opposition, (ECF Doc. # 321), and the Court denied the motion from the bench on June 1, 2017. (*Order Denying Motion to Dismiss Claim No. 5 Filed by Goetz Fitzpatrick LLP*, dated June 1, 2017 (ECF Doc. # 325).) Ridgemour thereafter retreated somewhat, apparently contending that *in*

---

[3] Adragna now argues that when he made this statement he thought that only $44,000 was still owing to GF, and the balance of the fees had been paid. ("*Ridgemour Proposed Conclusions*"), at 40. (ECF Doc. # 376.) The statement is remarkable. GF had moved six months earlier to compel the payment of its claim. (*Motion to Reopen Chapter 11 and for an Order Directing the Payment of Claim No. 5 Filed by Goetz Fitzpatrick and for Related Relief*, dated May 31, 2016 (ECF Doc. # 302-1).) The motion sought payment of $310,104.21, (*id.* at 13), and attached the stipulation that reduced the Claim to that amount. (*Id.*, Ex. 1.) Ridgemour's July 2016 opposition*, signed by Adragna*, acknowledged that GF was seeking payment of $310,104.21, (ECF Doc. # 306, at 1) and never asserted that any portion had been paid. Finally, during the November 1st colloquy, the Court distinguished between the entire claim of approximately $300,000, and the lesser amount of $43,000, and Adragna confirmed that Ridgemour was not challenging the entire Claim but only the fees after the date in July when the deeds were recorded. For Adragna to now suggest he thought on November 1, 2016 that all but $44,000 had been paid is disingenuous to the point of frivolous.

*pari delicto* only barred the recovery of charges incurred after June 18, 2008.  (*See* GFX 15.)

In the interim, GF filed a motion *in limine* to bar Ridgemour from relying on *in pari delicto* to bar any portion of the Claim, or alternatively, to bar any fees and expenses incurred prior to July 29, 2008.  (*See Goetz Fitzpatrick LLP's Memorandum of Law In Support Of Its Motion in Limine*, dated June 15, 2017 (ECF Doc. # 327).)  The Debtor opposed that motion and filed its own motion *in limine* to preclude GF from offering any evidence regarding unpaid fees or expenses based on *in pari delicto*. (*Notice of Ridgemour Meyer Properties LLC's Motion in Limine*, dated June 28, 2017 (ECF Doc. # 334).)  The Court reserved decision until trial.  (Transcript of 7/13/17 Hr'g at 13:19-14:2 (ECF Doc. # 340).)

**E.      The Merida Litigation**

A portion of the Claim and the Claim Objection relate to GF's services in connection with the Merida litigation.  The background to the Merida litigation is undisputed.  As noted, the Primary Lot was originally owned by Ridgemour subject to a mortgage held by Merida.  When Ridgemour transferred the Primary Lot to Pinnacle, Pinnacle agreed to assume the note and mortgage.  GDC and its principal, Martin Ginsburg ("Ginsburg"), promised to arrange for construction financing, and in connection with that financing, Merida agreed to subordinate its first mortgage to a new first lien to be pledged to the future construction lender.  When GDC failed to fund the development of the Property, Merida brought suit in the Westchester Supreme Court against Pinnacle, GDC, Ridgemour, Ginsburg and Meyer seeking a declaration to the effect that its note and mortgage had matured and that there were no defenses or bar to

foreclosure on its mortgage.

Ridgemour retained GF as counsel to defend the claims raised in the Merida Action, and GF also appeared on behalf of Meyer. Goetz Fitzpatrick did not obtain a separate retainer agreement from either the Debtor or Meyer, but Meyer understood that GF was representing himself and Ridgemour. (Tr. (8/8/17) at 140:22-141:7.) GF initially billed the Arbitration services and the Merida services as part of the same bill although Meyer understood that they were separate legal matters. (Tr. (8/8/17) at 82:21-23.) At some point, GF opened a separate billing matter for the Merida litigation starting with the April 2008 bill, but some of the Merida services continued to be billed to the former matter that covered the Arbitration. While the Merida bills started with the April services, the Merida bills covering April and May 2008 were not sent to Ridgemour until on or about July 1, 2008. (*See* GFX 2.) The portion of the unpaid pre-petition Claim attributable to the Merida litigation through August 11, 2008, the day of the chapter 11 filing, is $76,613.40, inclusive of Westlaw computer charges.[4] (*See* GX 2 (Sept. 30, 2008 statement).)

**F.    GF's Bills**

During the relevant period, the draft bills went through several levels of review before they were sent to Ridgemour. They were initially reviewed by each lawyer who entered time on the matter, and in the case of Carbone's clients, Carbone ultimately made a final review and submitted the pre-bill to the billing department to generate a

---

[4]    The Court included charges in the sum of $146.25 billed on the Petition Date because the case was not commenced until 9:08 p.m., and I assume that GF rendered the services on August 11, 2008 before the petition was filed.

final bill.  Carbone thereafter reviewed the final bill, approved it and it was mailed by the billing department.  GF followed this procedure with respect to the bills that were sent to the Debtor.  (Tr. (8/8/17) 188:22-190:9.)

For its services and expenses in connection with the Arbitration, which also included the Merida-related services and expenses through March 31, 2008, GF delivered the following statements (which included descriptive time entries) to the Debtor (*see* GFX 3)[5]:

| Invoice No. | Invoice Date | Period | Amount ($) |
| --- | --- | --- | --- |
| 24419 | 10/24/07 | 9/1-30/08 | 21,995.00 |
| 24787 | 11/14/07 | 10/1-31/07 | 81,617.39 |
| 26033 | 12/19/07 | 11/1-20/07 | 66,218.14 |
| 27475 | 01/18/08 | 11/12-12/17/07 | 73,402.06 |
| 28268 | 02/21/08 | 12/18-01/18/08 | 108,403.92 |
| 29027 | 03/24/08 | 1/20-2/12/08 | 57,095.27 |
| 29557 | 04/08/08 | 2/13-3/31/08 | 81,982.85 |
| 31492 | 07/01/08 | 4/1-5/31/08 | 74,303.03 |
| 32040 | 07/22/08 | 6/2-30/08 | 74,843.36 |
| 32881 | 09/05/08 | 7/1-31/08 | 57,401.88 |
| 33280 | 09/30/08 | 8/1-9/3/08 | 61,178.07 |
| 33902 | 10/21/08 | 8/4-7/08 (expenses) | 4,570.45 |
| 34847 | 11/24/08 | 10/3-13/08 | 1,016.47 |
| **Total** | | | **764,027.89** |

After GF opened a separate matter for the Merida action, it sent the following statements (which included descriptive time entries) to Ridgemour (*see* GFX 2)[6]:

| Invoice No. | Invoice Date | Period | Amount ($) |
| --- | --- | --- | --- |
| 31491 | 07/01/08 | 4/4-5/30/08 | 33,027.00 |
| 32039 | 07/22/08 | 6/1-30/08 | 26,090.18 |
| 32882 | 09/05/08 | 7/1-25/08 | 14,560.21 |
| 33152 | 09/24/08 | 8/4-25/08 | 8,189.59 |

---

[5]    This table includes only bills with new charges.  GF also sent a bill on January 26, 2009 for expenses in the sum of $4.34, but wrote off this amount in a statement sent on April 2, 2009.

[6]    This table includes only bills with new charges.

| | | | |
|---|---|---|---|
| 33279 | 09/30/08 | 9/2-25/08 | 962.17 |
| 33934 | 10/21/08 | 8/1-21/08 (expenses) | 2,153.37 |
| 34952 | 11/25/08 | 10/2-29/08 | 3,068.42 |
| 38109 | 04/02/08 | 11/5-14/08 | 1,437.50 |
| **Total** | | | **89,488.44** |

## G.    Ridgemour's Payments

The Debtor acknowledged that it received the bills for the Arbitration, (GFX 3), reflected in GFX 3, although not necessarily on a monthly basis, (Tr. (10/4/17) 12:2-19), and received the Merida-related billings, (GFX 2), in July or August 2008 when they were sent.  (Tr. (10/4/17) 29:6-12.)  The Debtor made the following payments, (*see* GFX 4), all of which were applied to the charges itemized in GFX 3:

| Date of Check | Check No. | Amount ($) |
|---|---|---|
| 09/11/07 | 1006 | 35,000.00 |
| 11/30/07 | 1021 | 68,572.39 |
| 01/08/08 | 1034 | 66,218.04 |
| 02/01/08 | 1041 | 60,977.50 |
| 03/31/08 | 1064 | 100,000.00 |
| 04/18/08 | 1058 | 27,188.35 |
| 05/01/08 | 1068 | 100,000.00 |
| 07/08/08 | 1096 | 42,343.60 |
| **Total** | | **500,299.88[7]** |

All of these payments were credited to the Debtor's account against the invoices generated by GF for its work on the GDC Arbitration.  (*See* GFX 3.)

---

[7]    GFX 4 includes two additional third party checks in the amounts of $100.00 and $955.06.  The latter payment was credited to the Debtor's open balance on the Arbitration.  (*See* GX 3 at 1 (11/14/08 entry.)  GF contends that the $100 payment was similarly credited, but it does not appear on the first page of GFX 3.  In addition, there is an approximate $2,700 discrepancy between the bills minus the payments and the original Claim.

## H.    Ridgemour's Objections

As noted, Ridgemour contends that the entire claim should be denied in full based on *in pari delicto* and collateral estoppel.  It also maintains that Ridgemour cannot be charged for the fees attributable to GF's representation of Meyer or computer legal research, GF's time entries are lumped or block-billed, a portion of its services were unreasonable or unnecessary, including Ellen August's time on the Arbitration and bankruptcy consultations on April 28, 29, 30, June 20, 26, July 17, August 4, 5 and 6 2008.  Ridgemour also contends that the Merida bills are entitled to the "missing witness presumption."  (*Ridgemour Proposed Conclusions* at 31-49; *Proposed Findings of Fact*, filed Mar. 5, 2018, at 3-13 (ECF Doc. # 377).)[8]

## CONCLUSIONS OF LAW

## A.    *Collateral Estoppel and In Pari Delicto*

New York law governs the preclusive effect of a New York state court judgment in federal court.  *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005) ("Because the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies.").  "Collateral estoppel, or issue preclusion, may be invoked in a subsequent action or proceeding to prevent a party from relitigating an issue decided against that party in a prior adjudication." *Staatsburg Water Co. v. Staatsburg Fire Dep't*, 527 N.E.2d 754, 756 (N.Y. 1988).  The

---

[8]    Although Ridgemour's *Proposed Findings of Fact and Conclusions of Law*, dated Mar. 5, 2018, are contained in a single document, Ridgemour divided the submission into two parts and docketed each part separately.  In this opinion, *Ridgemour Proposed Findings* refers to the document docketed at ECF Doc. # 377, and *Ridgemour Proposed Conclusions* refers to the document docketed at ECF Doc. # 376.

party invoking collateral estoppel must demonstrate that "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Hoblock*, 422 F.3d at 94 (internal quotation marks omitted).

The Debtor's argument regarding issue preclusion is based on the decision of the state court in *Ridgemour II*. There, the court dismissed the Malpractice Action based primarily on this Court's findings in *Ridgemour I* that Ridgemour and GF "acted dishonestly in connection with the Property transfer and the subsequent coverup." *Ridgemour II*, 2013 N.Y. Misc. LEXIS 4466, at *16. The state court also cited emails, mostly sent by Rotonde to others, including Carbone, in late June 2008, which "show that Rotonde actively worked with Carbone (and others) and knowingly participated in the deceitful scheme, despite his assertion that he was only following Carbone's advice." *Id.*

The state court did not review or rule on any of the services rendered by GF prior to late June 2008; those services were irrelevant to the Malpractice Action and its decision. The Malpractice Action asserted claims based on the filing of the deeds and the cover up. The parties did not litigate and the state court did not decide whether the services GF rendered in connection with the Arbitration prior to late June 2008 were dishonest or unreasonable or unnecessary, and collateral estoppel does not preclude the Court from deciding whether GF's fees, particularly those relating to services before the recordation of the deeds, were unreasonable or unnecessary. Ridgemour nevertheless contends that *in pari delicto* bars the entire Claim based on the state court's conclusion

that GF and Ridgemour were *in pari delicto* in connection with the acts relating to the recordation of the deeds and the cover up.

The doctrine of *in pari delicto* is more limited in contract disputes. In the leading case, *McConnell v. Commonwealth Pictures Corp.*, 166 N.E.2d 494 (N.Y. 1960), the defendant hired the plaintiff to negotiate a motion picture distribution agreement with a producer. The defendant agreed to pay the plaintiff $10,000 upon the execution of an agreement with the producer and a percentage of the gross receipts from the distribution of the pictures. The plaintiff successfully negotiated the agreement, the defendant paid the $10,000, but refused to pay anything further. *Id.* at 495.

In the ensuing lawsuit, the defendant contended that the plaintiff was not entitled to the percentage distribution because he had paid the $10,000 as a bribe to the producer to procure the agreement. *Id.* at 496. Agreeing with the defendant, the Court of Appeals explained that New York law denies "awards for the corrupt performance of contracts even though in essence the contracts are not illegal," and "a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance." *Id.* at 497. However, the corrupt performance must go to the heart of the plaintiff's claim:

> We point out that our holding is limited to cases in which the illegal performance of a contract originally valid takes the form of commercial bribery or similar conduct and in which the illegality is central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract.

*Id.* at 497-98.

Following *McConnell*, the reach of the *in pari delicto* doctrine in a contract action has been described in the following manner:

> An agreement which is "lawful on its face and which does not contemplate or necessarily entail unlawful conduct in its performance is enforceable by the promisee even though he engages in unlawful activity in the agreement's performance" (*see*, *Dodge v. Richmond,* 10 A.D.2d 4, 14, 196 N.Y.S.2d 477, *affd.* 8 N.Y.2d 829, 203 N.Y.S.2d 90, 168 N.E.2d 531), provided the promisee does not require the aid of the illegal transaction to make out his case (*see*, *McConnell v. Commonwealth Pictures Corp.,* 7 N.Y.2d 465, 471, 199 N.Y.S.2d 483, 166 N.E.2d 494; *Ferkin v. Board of Educ.,* 278 N.Y. 263, 268, 15 N.E.2d 799).

*Hilgendorff v. Hilgendorff*, 660 N.Y.S.2d 150, 151 (N.Y. App. Div. 1997); *accord ImagePoint, Inc. v. JP Morgan Chase Bank, N.A.*, 27 F. Supp. 3d 494, 515 (S.D.N.Y.) (report and recommendation), *objections overruled*, 2014 WL 3891326 (S.D.N.Y. 2014); *Globaltex Group Ltd. v. Trends Sportswear Ltd.*, Case No. 09-cv-0235, 2010 WL 1633438 *4 (E.D.N.Y. 2010) (Weinstein, J.); *Uhl v. Uhl*, 711 N.Y.S.2d 271, 272 (N.Y. App. Div. 2000).

Here, GF incurred unpaid fees pursuant to an enforceable retainer agreement for legal services which did not contemplate any wrongful conduct. Accordingly, *in pari delicto* does not bar the recovery of fees that accrued prior to GF's improper acts.

That GF committed improper acts at some point is not disputed, and the fees incurred in connection with those acts are also part of the Claim. The state court determined that GF's conduct in connection with the filing of the deeds and the failure to disclose the filing to the Arbitrator rose to the level of wrongdoing sufficient to trigger *in pari delicto*, and GF concedes that "the issue of whether Goetz Fitzpatrick engaged in immoral conduct is *res judicata*." (*Goetz Fitzpatrick LLP's Post-Trial Proposed Findings of Fact and Conclusions of Law,* dated Feb. 9, 2018 ("*GF Proposed Findings & Conclusions*"), at 36 (ECF Doc. # 371).) The state court identified improper acts by Carbone in late June that were part of a "deceitful scheme," *Ridgemour II*, 2013 N.Y.

20

Misc. LEXIS 4466, at *20, and the Court has previously recounted Carbone's failure to disclose to GDC's attorneys and the Arbitrator during the negotiations that continued through July that the deeds had been signed and would be recorded despite the fact that the mortgage and indemnity agreements were not finalized. *Ridgemour I*, 413 B.R. at 110-12.

Fixing a precise moment when the fee claim should be cut off based on GF's immoral acts is something that no court has had to determine until now. It requires consideration of all of the facts adduced at the trial on the Claim Objection. The state court referred to e-mails that Carbone received in late June discussing the filing of the deeds, but it was no secret that Ridgemour was anxious to file the deeds and proceed with the project. Furthermore, at least as of July 3, 2008, Carbone believed that the recordation of the deeds was tied to the completion of the mortgage documents. Carbone proposed to write to the Arbitrator on that day complaining that GDC was taking unreasonable positions regarding the mortgage documents in an attempt "to delay the transfer of the property to [Ridgemour]," GDC was "hoping to have the transfer of the properties delayed," and "[u]nder no circumstances should the conveyances of the properties be delayed until the conclusion of the damage hearing." (RX Q.)

The push to file the deeds without the mortgage in place revved up on July 16, 2008, a week after the issuance of the Interim Award. On July 16, 2008, Rotonde sent an email at 9:31 a.m. to Carbone and Robert Rattet, a bankruptcy lawyer, advising them that the deeds had been signed but had not been filed, and Ginsburg had created a "deadlock" regarding the mortgage and other documents and had asked the Arbitrator

21

to intervene.  (RX F.)[9]  Time entries on the following day indicate that Carbone participated in an inter-office conference, with a person identified as "TF," "Re Interim Order; transfer of deed," Carbone, Rotonde and Rattet spoke about "the Interim Award, Deeds, etc.", and Carbone, Rotonde and Meyer participated in a "conference call . . . re same."  (GFX 3 (Sept. 5, 2008 statement).)  Carbone testified that he told Rotonde not to do anything with the deeds and wait until the deeds, mortgages and other documents could be exchanged simultaneously.  He said that filing the deeds would just give fuel to GDC to ask the Arbitrator to reverse the prior rulings that had been favorable to Ridgemour.  Rattet, on the other hand, was encouraging Rotonde to file the deeds despite Carbone's adamant opposition.  (Tr. (8/9/17) at 31:5-32:3.)  Rotonde disputed Carbone's account, testifying that Carbone told him that the deeds could be recorded as soon as the Interim Award was entered.  (Tr. (12/11/17) at 137:20-138:18.)

The draft deeds were in the possession of Carol Dall, Ridgemour's attorney.  On July 21, 2008, she delivered the deeds for recordation, Rotonde advised Carbone of that fact in an email the same day and asked Carbone to "call me at home if you can.  I am at home."  (*See* RX G.)  Carbone testified that he did not see Rotonde's email and first learned that the deeds had been delivered for recordation on July 22, 2008, after a conference call that day with the Arbitrator.  (Tr. (8/9/17) 34:8-35:8.)  However, Rotonde's email was sent at 8:41 a.m. on July 21, 2008, and Carbone's time records for July 21, 2008, included entries for "conference call with AJ[Rotonde]/ Carol [Dall] re: response to Scarola [the Arbitrator]; telephone conference with AB [apparently Aaron

---

[9]    The final email in the string, sent two minutes later by Rattet to Rotonde, asked "[w]hy were the deeds not recorded?"  (*See* RX F.)  Carbone was not copied on this email, he could not identify it and it was not received into evidence.  (Tr. (8/9/17) at 27:20-28:12.)

Boyajian, a GF real estate partner] re: same; further multiple telephone conferences with AJ re: same." (GFX 3.) While there were many issues to discuss, it is difficult to believe that the delivery of the deeds for recordation was never mentioned. Yet during the conference call the next day with the Arbitrator and GDC's attorneys, Carbone did not advise anyone that the deeds were about to be recorded or had been recorded.

In fact, other near contemporaneous evidence indicates efforts to cover it up. On July 25, 2008, Ellen August sent an email to Rotonde and Meyer, with a copy to Carbone, reminding them "Merida should not be privy to anything that is happening now with regard to the transfer of the properties because we don't want Scott Wyner to relay any information to Brad Schwartz or Vuotto." (RX O.) Wyner represented Merida, Schwartz represented Pinnacle and Vuotto represented GDC. (Tr. (12/11/17) at 29:25-30:25.) August was not involved with the transfer of the Property, and was pretty sure she wasn't the person who thought of sending the email. (Tr. (12/11/17) at 29:6-16.) Carbone was her boss, it is not credible that she would have sent the email without Carbone's knowledge and blessing, and August declined to say that she had not discussed it with him. (Tr. (12/11/17) at 31:6-15.)

Accordingly, I find that the failure to disclose the recordation of the deeds to the Arbitrator or GDC on July 22, 2008, and the affirmative efforts to keep it a secret until GDC discovered the transfers on its own call for the denial of all fees incurred after July 21, 2008.[10] This conclusion is also consistent with Ridgemour's contention that GF did not do anything improper until July 21, 2008, when he didn't tell anyone the deeds had

---

[10]    Through July 21, 2008, GF's accrued unpaid fees and expenses relating to the Arbitration matter totaled $182,993.31. (*See* GFX 3 (Sept. 5, 2008 statement).)

been recorded and continued to negotiate.  (*See Deposition of William Meyer*, held Mar. 21, 2017, at 179:18-23 ("*Meyer Deposition*"); *accord* Tr. (12/11/17) at 172:15-18 (Rotonde testimony).)

In addition, the services rendered after GDC apprised the Arbitrator of what Ridgemour had done, culminating in the bankruptcy filing, were tainted by GF's wrongful conduct.  They dealt primarily with the aftermath of the wrongful recordation, including an accelerated schedule that addressed the Arbitrator's August 4, 2008 demand for personal guarantees and a letter of credit that resulted from the wrongful recordation of the deeds, litigation commenced by GDC, which also resulted from the recordation of the deeds, and the preparation for bankruptcy, which Rotonde, Meyer and Ridgemour's bankruptcy counsel attributed in large part to the Arbitrator's August 4th ruling.  (*See* GFX 3 (Sept. 30, 2008 statement).)  *McConnell* and its progeny bar the contractual claim for fees based on those services.[11]

GF's right to recover legal fees in connection with the Merida matter is not affected by *in pari delicto*.  Ridgemour does not argue that GF committed any wrongful or immoral act in connection with that representation.

---

[11]    GF argues that *in pari delicto* is inapplicable because Ridgemour did not rely on GF's immoral conduct and was not injured by the conduct.  (*GF Proposed Findings & Conclusions* at 36-37.)  The argument ignores the central premise of *McConnell*; a person cannot recover for the corrupt performance of a legal contract.  In addition, Ridgemour suffered substantial injury as a result of the secret recordation of the deeds and the cover up.  It was forced to file bankruptcy to stay the Arbitration, Ridgemour was displaced as a debtor in possession and a chapter 11 trustee was appointed, and the chapter 11 trustee and his professionals were awarded in excess of $485,000 in legal fees and expenses.  (ECF Doc. ## 265-67.)

**B.    Merida Charges**

**1.    Retention of GF**

Ridgemour contends that it never retained GF to represent it in the Merida matter.  Although GF did not obtain a separate retention agreement (the Retainer covered all matters referred to GF), Meyer testified that he knew that Merida was a matter separate from the Arbitration, (Tr. (8/8/17) 82:21-23), and that Ridgemour had retained GF to represent it in the Ridgemour matter.  (Tr. (8/8/17) 140:22-141:7.)  The contention that Ridgemour did not retain GF in the Merida matter is belied by the evidence.

**2.    Missing Witness Presumption**

The evidence showed that the Merida services were included with the Arbitration bills through the end of March 2008.  Beginning with the April 2008 bill, GF opened a separate matter for Merida, but the April and May 2008 bills covering the Merida services during those months were dated July 1, 2008, and could not have been sent before then.  Subsequent bills were generally prepared around the end of the month in which the services were rendered.  (*See* GFX 2.)  According to Ridgemour, GF was under a duty to produce a witness to support its argument that GF established a separate billing matter for Merida in April 2008, and that GF thereafter sent monthly bills to Ridgemour.  (*Ridgemour Proposed Findings* at 8.)  Ridgemour also points to other discrepancies that a GF "missing witness" supposedly had to explain, (*id.* at 9), and to address Ridgemour's contention, as to which Ridgemour produced no evidence, that GF fabricated the Merida bills after the bankruptcy filing to rebut the possible effect of *in pari delicto* (which was not raised until several years later).  (*Id.* at 10.)

The argument assumes a factual dispute where none exists.  First, GF does not contend that it sent Merida bills each month starting with the April 2008 statement.  The April statement was dated in July.  Moreover, Heidi Brown, Ridgemour's office manager, admitted at her deposition to receiving the Merida bills starting in July or August.  (Tr. (10/4/17) at 29:6-13.)[12]

Documentary evidence also confirms that Ridgemour began receiving Merida bills in late July 2008 *before* the bankruptcy.  According to GF's statements, each dated July 22, 2008, Ridgemour owed GF $149,146.39 in connection with the Arbitration, (*see* GFX 3), and $59,117.18 for services rendered and expenses incurred in connection with the Merida matter.  (*See* GFX 2.)  The unpaid fees totaled $208,263.57.  GF did not send another set of statements until after Ridgemour filed its bankruptcy petition.  Both the *Local Bankruptcy Rule 1007 Affidavit*, filed on August 11, 2008, and the schedules filed two weeks later, listed GF's claim as undisputed in the amount of $208,263.00.  Ridgemour obviously based the amount of the GF claim on the July 22 statements, and hence, received both statements before it filed its bankruptcy petition and its schedules.

### 3.    Meyer Services

GF represented both Ridgemour and Meyer in the Merida matter, their positions were identical, (*Meyer Deposition* at 48:8-20), GF billed Ridgemour for all of the services and Rotonde had the expectation that Ridgemour would pay all of the Merida

---

[12]    At trial, Brown implied that her deposition testimony on this point was not accurate, claiming she was "intimidated" during her deposition.  (Tr. (10/4/17) at 29:16-18.)  Having had the opportunity to observe her while testifying, I find her totally incredible, and reject her testimony that she did not receive the Merida bills in July or August.  In addition, she did not correct her deposition transcript she was presumably less intimidated.  (*See id.* at 29:24-30:5.)  Nor, as the succeeding text explains, could Ridgemour have prepared its *Local Bankruptcy Rule 1007 Affidavit* or the schedules without those bills.

fees.  (Tr. (12/11/17) at 98:18-21.)  When GF sought to collect the Merida fees from

Meyer after the Petition Date, Meyer responded that he had reviewed the invoices and

that very few hours had anything to do with him personally.  (GFX 18.)  At trial,

however, he testified that half of the unpaid $79,000 incurred on the Merida matter

before the Petition Date was attributable to GF's representation of him personally, and

shouldn't be charged against Ridgemour.  (Tr. (8/8/17) 56:18-25.)  He did not, however,

offer to pay those charges.

In addition, this objection was an afterthought first raised at the trial.  Brown

prepared the interrogatory responses in consultation with Meyer.  (Tr. (10/4/17) 75:2-

20.)  The interrogatories asked Ridgemour to identify every objectionable time entry

relating to Merida.  (GFX 5, at 20.)  Ridgemour responded that the hours were

excessive, GF failed to inform Ridgemour that it had raised its billing rates, Ridgemour

never received a bill from GF regarding Merida — which was false, and Ridgemour

never retained GF in the Ridgemour matter— which was also false.  (*See* GFX 5, at 20-

21.)  But Ridgemour never stated that any time charges were attributable to the

representation of Meyer personally.  The evidence shows that Ridgemour through

Meyer knew that GF was representing Ridgemour in the Merida matter, accepted the

services without protest and paid the bills, which included the Merida services.  I

conclude that Meyer's testimony was not credible, and find that that the services related

to the Merida matter were performed for the Ridgemour or for the mutual benefit of

Meyer and Ridgemour.

### 4.    The Increased Billing Rates

Ridgemour complains that GF raised its billing rates without telling Ridgemour.

This argument lacks merit.  First, the Retainer authorized GF to raise its rates.  (GFX 1, at 3.)  Second, even if GF did not expressly advise Ridgemour of the rate increase, it was apparent from the statements that GF sent to Ridgemour.  (GFX 2, 3.)  From the time of the retention in September 2007 through June 2008, the rates remained unchanged and were consistent with those set forth in the Retainer.  Carbone billed his time at $425 per hour and Ellen August billed her time at $360 per hour.  According to the bill covering July 2008 which was prepared on or about September 5, 2008, their hourly billing rates were increased, respectively, to $470 and $400.

### 5. Reasonableness

The Court will address the reasonableness of the Merida bills together with the reasonableness of the Arbitration bills immediately below.

## C. The Reasonableness and Necessity of the Services and Expenses

### 1. Introduction

The rules that govern fee awards and time record keeping in non-bankruptcy matters mirror those that apply in bankruptcy cases.  A reasonable attorney's fee is a fee "which represent[s] the reasonable value of the services rendered."  *NYCTL 1998–1 Trust v. Oneg Shabbos, Inc.*, 830 N.Y.S.2d 763, 764 (N.Y. App. Div. 2007); *accord Diaz v. Audi of Am., Inc.*, 873 N.Y.S.2d 308, 311 (N.Y. App. Div. 2008).  In general, factors to be considered include "(1) the time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; (2) the lawyer's experience, ability, and reputation; (3) the amount involved and benefit resulting to the client from the services; (4) the customary fee charged for similar services; (5) the contingency or certainty of compensation; (6) the results obtained; and (7) the

responsibility involved." *Diaz v. Audi of Am., Inc.*, 873 N.Y.S.2d at 311; *see also Matter of Freeman*, 311 N.E.2d 480, 484 (N.Y. 1974).

The fee applicant bears the burden of proving the reasonableness and necessity of its services.[13] *Alicea v. City of New York*, 272 F. Supp. 3d 603, 609 (S.D.N.Y. 2017); *Boutros v. JTC Painting & Decorating Corp.*, No. 12 Civ. 7576(PAE), 2014 WL 3925281, at *4 (S.D.N.Y. Aug. 8, 2014); *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011). Courts generally apply the "lodestar" method under which they arrive at a fee "by multiplying 'the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate.'" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar should be based on the prevailing market rates for attorneys with comparable skill and standing in the pertinent legal community. *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000). "Hours that are excessive, redundant, or otherwise unnecessary, are to be excluded ... and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch*, 148 F.3d at 172 (citations and internal quotation marks omitted).

Ridgemour has not challenged GF's billing rates (other than the fact that they were raised without express notice) and based on the Court's experience, they are

---

[13] GF contends that it met its burden of going forward though the filing of its proof of claim. Under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, "[a] proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." If the claim is based on a writing, "a copy of the writing shall be filed with the proof of claim." FED. R. BANKR. P. 3002(c)(1). GF's claim is based on the Retainer which it did not attach to the Claim, but the question of the evidentiary force of the Claim is academic. After four days of trial, the Court is satisfied that GF met its burden of proof to the extent the Claim is allowed.

certainly reasonable. Carbone, a senior partner, billed $425 per hour for his time until July 2008, when GF raised his hourly rate to $470. Everyone else that regularly worked on the matter billed at a lower rate. Furthermore, Ridgemour has not challenged the time entries as vague in the sense that it could not determine what services were provided. Brown testified that she had no difficulty identifying the services that were performed. (Tr. (10/4/17) at 63:5-22.) Instead, Ridgemour contends that it is unreasonable to charge the Debtor for (1) Ellen August's attendance at the twelve arbitration days, (2) the bankruptcy consultations in April, June, July and August, 2008, and (3) the cost of the LEXIS and Westlaw computer time. (*Ridgemour Proposed Findings* at 12-13.) In addition, Ridgemour argues that GF block-billed its time.

### 2.    Excessiveness

Ridgemour's complaint about paying for Ellen August's time is part of the more general contention that the bills were excessive. (Tr. (12/11/17) at 65:20-66:20.) Ridgemour argues that it was not reasonable or necessary for her to attend the Arbitration as a "second seat" during the twelve days of trial, but I disagree. The Arbitration was complex and involved a substantial amount of work. In explaining the reasons for filing the chapter 11 case, Rotonde stated, "[t]he arbitration had been commenced in November 2006 and during the many months that followed extensive discovery had taken place, a multitude of documents had been submitted and reviewed and hours of testimony had been heard." (GFX 13, at ¶ 2.)

Carbone amplified the reasons why the matter was so complex and required so much legal work. Ridgemour had to demonstrate to the Arbitrator that the Pinnacle project was feasible. Among other tasks, GF presented three feasible alternatives,

30

supplied real estate appraisals, rebutted GDC's appraisals, dealt with deteriorating infrastructures and issues relating to the construction on the sites and addressed building code violations, all against the backdrop of the parties' obligations under the Pinnacle Operating Agreement. (Tr. (8/8/17) 172:25-176:17.) He and Ellen August attended twelve arbitration hearings, and had to prepare fact and expert witnesses, including witnesses in real estate, architecture and accounting. (Tr. (8/8/17) 176:19-177:21.) In addition, GDC put on its own witnesses which GF had to cross-examine. (Tr. (8/8/17) 178:11-179:10.) In the Court's experience, it is not unreasonable or unusual for a "second seat" to assist trial counsel and attend the trial particularly in complex commercial litigation involving numerous documents and witnesses.

Moreover, **Ridgemour was "elated" and "delighted" with the results of the Arbitration, and had no cause to complain about the manner in which GF was conducting the case.** Meyer viewed the ruling that the Property would be returned to Ridgemour as an extremely positive result, (*Meyer Deposition* at 127: 6-15), and was also satisfied with GF's services in procuring those results, testifying during his deposition that GF had accomplished what Ridgemour wanted. (*Meyer Deposition* at 107:16-108:5.) He and Rotonde only became dissatisfied when, on August 4, 2008, the Arbitrator required them to provide personal guarantees, and that requirement was due to Rotonde's and Dall's secret recordation of the deeds.

At trial, Rotonde and Brown testified that they constantly complained to Carbone about the legal fees, especially Ellen August's time. **Rotonde testified that he would send the bills to Meyer in Florida for his review, and he and Meyer would discuss that they were excessive before Meyer authorized payment. Further, he complained to Carbone**

about Ellen August's participation as well as the general excessiveness on almost every occasion when the bills came in and the checks went out. (Tr. (12/11/17) at 66:21-67:21.) According to Rotonde, Carbone responded on two or three occasions that Ridgemour should send a check on account and they would work it out later. (Tr. (12/11/17) at 67:22-68:3.) These alleged communications were oral, and although asked to do so in the interrogatories, Ridgemour did not identify any written complaints. (GFX 5, at 19-20, 34-35.)

I have no doubt that Ridgemour was concerned about the mounting legal fees and expenses as any client would be. I do not, however, credit the testimony that he or Brown contemporaneously protested to Carbone that Ellen August's or GF's services were unreasonable, unnecessary or excessive, and instead, credit Carbone's testimony that they never did. (Tr. (8/8/17) 169:13-170:8.) While Rotonde and Meyer were concerned about the Arbitrator's decision to require their personal guarantees, Ridgemour did not articulate any dissatisfaction with GF's services until the determination of the Trustee Motion and never protested in writing or orally to GF. According to its interrogatory responses, its only form of protest was to pay less than the full amount of the bill.[14]

---

[14]    The relevant interrogatories and responses are the following:

> **6.**    Identify whether the Responding Parties [the Debtor] ever provided GF with written or verbal notice of their dispute to the amount of legal fees sought by GF in connection with the Ginsburg Development LLC matter?

> **Answer:**    After paying a number of GF bills in accordance with amount invoiced, Respondent noted a significant amount of excess billing hours. Respondent [Debtor] stopped paying the amount invoiced in objection to the excess billing hours.

> **7.**    If the answer to Interrogatory No.6 above is that a written communication of a dispute was delivered to GF by the Responding Parties, provide a copy of the document of GF in accordance with the General Instructions provided herein.

Even this excuse is not credible.  For the first few months after the Retainer was signed, Ridgemour paid the balance shown in the most recent statement, and owed zero as of January 9, 2008.  (*See* GFX 3, at 1 (Client Ledger Report).)  When Ridgemour started to fall behind, Carbone asked Rotonde on July 1, 2008 to send money because "[m]y accounting department is giving me grief."  The email attached a statement that showed a total due of $42,343.60.  (RX C.)  Rotonde responded within thirty minutes with an apology: "[s]orry first thing when i get back," (GFX 16), and on July 8, 2008, sent a check in the sum of $42,343.60.  (*See* GFX 4.)  Rotonde did not protest or suggest that GF was overcharging Ridgemour or that the bills were excessive or that Carbone had agreed to a credit, and none of the checks sent to GF indicated that they were sent under protest or with a reservation of rights.  Furthermore, Ridgemour's *Local Bankruptcy Rule 1007 Affidavit* filed on the petition date and its bankruptcy schedules filed two weeks later, both attested to by Rotonde, (*see* GFX 7, at ECF pp. 3 of 15), stated that the then outstanding, billed balance of fees in the Arbitration and the Merida action was undisputed.[15]  Finally, when Ridgemour objected to GF's fees in November 2009, it

---

**Answer**:        Checks sent to GF by Respondent were far less than billed by GF providing express notice of excessive billing to [Ridgemour].

**8.**        If the answer to Interrogatory No.6 above is that a verbal dispute was made to GF by the Responding Parties, identify:

(a)    the name of the person who communicated the dispute to GF;

(b)    the name of the person at GF to whom the dispute was communicated by the Responding Parties;

(c)    the date upon which the dispute was communicated to GF;

(d)    a detailed statement of the nature of the dispute; and

(e)    a detailed statement of GF's response, if any.

**Answer**:        Please see answer to "7", above.

[15]    Rotonde first testified that he was not aware that he had the right to schedule a claim as disputed, (Tr. (12/11/17) at 86:16-23), although his ability to do so is evident from the boxes on the schedules that he could have checked.  In fact, several other claims were scheduled as contingent, unliquidated or

did not claim they were unreasonable or excessive.  In short, this argument is newly minted.

In addition, the identification of unreasonable fees and expenses in the interrogatory responses is unpersuasive.  Meyer first looked at GF's bills to assess their reasonableness when he was preparing answers to GF's interrogatories in November 2016, eight years after they were delivered to Ridgemour.  (Tr. (8/18/17) at 70:12-15.)  In addition, he did not review any of GF's work-product.  In preparing the interrogatory answers, he discussed the GF statements at length with Heidi Brown, and deducted fees where she thought she rather than GF had done the work, (Tr. (8/18/17) at 67:1-69:1), or the charges looked "egregious."  (Tr. (8/18/17) at 70:16-23.)  Meyer is a lawyer but works as a real estate developer and does not practice law, Heidi Brown is not a lawyer, and their "guesstimates" of how long they think it should have taken to perform legal services rendered in litigation eight years earlier does not provide any insight that assists the Court.

Moreover, many of their criticisms mischaracterize the time records by summarizing or omitting services, making it seem that the attorney did less work than the time entries reflect.  The very first entry they criticize is a good example.  They complain that Ellen August billed nine hours on April 1, 2008 identifying the following services: "prep for arbitration hearing and revising email from Meyer to Ginsberg/assemble transcripts and exhibits," and contend that the time charges should

---

disputed.  (*See* GFX 7, at ECF pp. 12 & 13 of 15.)  He then testified that scheduling the claim as undisputed was a strategic ploy based on the advice of bankruptcy counsel who wanted to keep GF "as a friend," and he was not aware of the legal effect of scheduling a claim as undisputed.  (Tr. (12/11/17) at 87:21-88:16.)

be reduced by two hours.  (GFX 5, at 2.)  The actual time entry identifies the following

services:

> Preparation for arbitration hearing, including reviewing correspondence
> re Citibank; drafting and revising letter to Scarola re agenda; revising
> Meyer e-mail to Ginsburg; numerous telephone conferences with clients;
> assembled exhibits and transcripts; reviewed McWalters transcript re
> reservation of right to cross-examine; conferred with DJC re hearing

(GFX 3 (July 1, 2008 Statement).)  The interrogatory response truncates the detail, and

omits any reference to the review of correspondence, the drafting correspondence to the

Arbitrator, the telephonic and face-to-face conferences in which she participated and the

specific documents she reviewed.

Similarly, their next criticism focuses on the twelve hours Carbone billed the

same day.  Meyer and Brown listed the services as "phone calls, review of bullet points,

prep for AAA and revising email from Meyer to Ginsburg," and contend that the time

should be reduced by three hours.  (GFX 5, at 2.)  The actual time entry reads as follows:

> preparation of correspondence Bill Fisher re: bio info.; preparation of
> correspondence Scarola re: cash flows; revise BM e-mail to MG $75k
> renovations; multiple telephone conferences with Bill Fischer re: cash
> flows; review of file to prep. for AAA; telephone conference with Bill Meyer
> re: review of cash flows; meeting with Bill to prep for AAA

(GFX 3 (July 1, 2008 Statement).)  Meyer's and Brown's comment suggests that

Carbone made a few phone calls, reviewed a document, revised an email and did some

preparation for the Arbitration.  In fact, the time entry indicates that Carbone

performed numerous services primarily in preparation for an Arbitration hearing

scheduled to occur two days later.  Any trial lawyer appreciates the time consuming

nature of trial preparation, particularly when the trial is only a day or two off.  To

suggest that he should have spent three hours less preparing for trial is arbitrary and without any basis in fact.

Lastly, a particularly graphic example of Brown's and Meyer's problematic time guesstimates relates to their contention that Carbone's time billed on July 2, 2008 should be reduced from 5.75 hours to four hours, describing the service as "review multiple items." (GFX 5, at 6.) On this date, GF and GDC's lawyers were attempting to memorialize the Arbitrator's rulings into what ultimately became the Interim Award, and prepare the various documents that would be required. The actual time entry states:

> review of transcripts re: amount of mortgage; conference call Bill/AJ re: above; receipt and review of indemnity agreement, cover letters to Vuotto; revise Interim Award per discussion AJ/Bill; preparation of correspondence Arb. re: same; review of file re: documents to be presented on Damage claim; review of AB comments on mortgages; receipt and review of 6/18 cashflow from Bill Fischer; receipt and review of Vuotto 7 /1 request; preparation of correspondence Vuotto re: same; review of mortgage comments with AB; receipt and review of proposed note; telephone conference with Bill re: Interim Award; receipt and review of AJ e-mail re: Interim Award; receipt and review of Bill's e-mail re: Interim Award, cash flows, finalize Interim Award; preparation of correspondence Bill/AJ re: same; finalize itemized damage draft; preparation of correspondence Bill/AJ re: same

(GFX 3 (Sept. 5, 2008 Statement).) While the Court has not matched every description in the interrogatory responses with the time entries, the overwhelming number that the Court has reviewed reflect similar incomplete summaries by Brown and Meyer and the omission of many services. It is hardly surprising that they viewed the services they listed as excessive; they mischaracterized those services.

Although the objections prepared by Meyer and Brown are arbitrary and lack any articulated basis beyond their "say so," GF still has the burden of demonstrating the

reasonableness of its fees. "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*, 148 F.3d at 173. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed, and where the documentation of hours is inadequate, the Court may reduce the award accordingly. *Hensley v. Eckerhart*, 461 U.S. 424,433 (1983).

Lumping or block billing may hinder a Court's ability to decide reasonableness. Lumping or block billing is a timekeeping practice that involves including multiple services in a single, aggregated time entry without any breakdown of the time spent on each service, and complicates a court's efforts "to gauge the reasonableness of time expended on each activity." *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank of Australia Creditanstalt*, No. 04 Civ. 3600 (SWK), 2005 WL 3099592, at *5-6 & n.9 (S.D.N.Y. Nov. 17, 2005); *accord LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 525 (S.D.N.Y. 2010) ("[B]lock-billing can make it 'exceedingly difficult for courts to assess the reasonableness of the hours billed. In such circumstances courts have found it appropriate to cut hours across the board by some percentage.'") (internal citations omitted); *Williams v. New York City Hous. Auth.*, 975 F. Supp. 317, 327 (S.D.N.Y. 1997) ("Fee applicants should not 'lump' several services or tasks into one time sheet entry because it is then difficult, if not impossible, for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided . . . . It is not the court's job to decipher time entries and guess how much time each activity took . . . . It is the responsibility of the applicant to make separate time entries for each activity.") (internal quotation marks and citations omitted).

The Court raised the issue of GF's block billing *sua sponte* at trial. Ridgemour incorporated the point in its post-trial submission, and asks the Court to reduce GF's fees across the board. (*Ridgemour's Proposed Conclusions* at 38-39.) GF counters that I cannot reduce its fee based on a deficiency that Ridgemour did not raise, (*GF Proposed Findings & Conclusions* at 51-25), and Ridgemour waived the argument by not raising it itself. (*See Goetz Fitzpatrick LLP's Corrected Reply Conclusions of Law in Response to Debtor's Post-Trial Submission*, dated Mar. 26, 2018, at ¶¶ 47-48 (ECF Doc. # 395).)

As GF's authorities make clear, the rationale for this rule is based on unfairness to the fee applicant. "The fee applicant would have been entitled to offer evidence in support of the reasonableness of her request had the defendants put in issue either the fact that certain time had been spent, or the necessity for doing so." *Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, *reinstated,* 807 F.2d 49 (3d Cir.1986), *cert. denied,* 481 U.S. 1049 (1987); *accord Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir. 1989); *cf. McPhatter v. Cribb*, No. 97-CV-0360 (EF), 2000 WL 743972, at *3 & n. 8 (W.D.N.Y. May 25, 2000) (noting that the fee applicant had "proffered a detailed ledger of the nature and extent of the legal work performed," and the opposing party failed to object).[16]

---

[16]    GF's fourth authority, *Cassano v. Cassano*, 949 N.Y.S.2d 130 (N.Y. Adv. Div. 2012) reversed the trial court's *sua sponte* reduction of 25% of fees it deemed excessive, stating that "since the issue of whether the attorney's fees earned by the appellant were excessive had not been raised, the Supreme Court improperly granted such relief sua sponte." *Id.* at 131. As the superseding text notes, the issue of block billing was raised with the parties mid-trial, and GF had an opportunity to address it during the trial and in its post-trial briefing.

GF's argument suffers from two obvious shortcomings.  First, a fee applicant bears the burden of proof, as does a creditor seeking the allowance of its claim in a bankruptcy case.  If the time records or other evidence do not allow the Court to determine the reasonableness or necessity of the services because of block billing or for any other reason, the fee applicant has failed to carry its burden.  Second, this case does not suffer from any of the unfairness highlighted by GF's authorities.  The Court raised the issue of block billing on September 28, 2017 in connection with GF's motion for judgment after Ridgemour had completed its direct case.  The Court denied the motion stating that GF's fees might be subject to an across-the-board reduction based on block billing because block billing might prevent the Court from determining whether the fees were reasonable.  (Tr. (9/28/17) 8:3-14.)  The Court subsequently heard two more days of testimony at which GF had the opportunity to submit evidence to correct or explain any deficiencies noted by the Court.  Furthermore, Ridgemour raised the issue of block billing in its post-trial submission, and GF addressed the question in the *GF Findings & Conclusions* and in its reply to Ridgemour's submission.

Block billing does not, however, render the invoiced amounts *per se* unreasonable, and missing detail can be supplied through other evidence that supports the reasonableness of the fees.  *Freidman v. Yakov*, 30 N.Y.S.3d 58, 60 (N.Y. App. Div. 2016); *J. Remora Maintenance LLC v. Efromovich*, 960 N.Y.S.2d 27, 29 (N.Y. App. Div.), *motion for leave to appeal denied*, 995 N.E.2d 183 (N.Y. 2013); *546-552 West 146th Street LLC v. Harlem I LLC*, 950 N.Y.S.2d 24, 28 (N.Y. App. Div. 2012).  And while Courts can order an across the board reduction when block billing makes it inherently difficult to decide whether the number of hours is reasonable, courts typically limit

across the board cuts to those situations where there is evidence that the hours billed were independently unreasonable or the block billing mixed tasks that were compensable with tasks that were not. *Hnot v. Willis Group Holdings Ltd.*, No. 01 Civ. 6558(GEL), 2008 WL 1166309, at *6 (S.D.N.Y. Apr. 7, 2008) (collecting cases).

GF did not block bill compensable and non-compensable tasks, and aside from Ellen August's participation at the Arbitration and some bankruptcy services addressed below, Ridgemour has not argued that the time or the corresponding services were unreasonable on their face.[17]  Furthermore, while GF attorneys often block billed their time on any given day, the details of the services identified in the time entries, amplified by Carbone's and August's trial testimony, allow the Court to determine the precise task reflected in each time entry and make an overall assessment whether the aggregate time reflected was reasonable given the nature of the work and the representation. Moreover, Meyer and Brown were able to comment on the reasonableness and necessity of GF's services simply by reviewing the time records, and Ridgemour never complained about block billing until the Court raised the issue.  Accordingly, the Court declines to impose an across the board percentage reduction based on block billing.

Ridgemour also complains about the reasonableness of the Merida bills.  (*See* GDX 5, at 21-28.)  However, its "critique" of the time records suffers from the same deficiencies; Brown and Meyer made their reasonableness determinations eight years after they received the bills, they purported to summarize the services and ignored many services included in the time entry, and supported their analysis with nothing more than

---

[17]    Ridgemour cherry-picked certain entries in the interrogatory responses, but on the whole, did not take issue with the reasonableness of the time expended or the services rendered.

their uninformed "say so." The Court is satisfied from its review of the Merida time

records beginning with the July 1, 2008 statement and the evidence relating to the

issues in the Merida case and the services required that the services were reasonable and

necessary.

### D.    Computer Legal Research

GF billed a total of $15,762.45 in Westlaw charges to Ridgemour between March

25, 2008 and July 30, 2008. (GFX 2, 3.) In its interrogatory responses, Ridgemour

only objected to $4,917.32 in Westlaw charges. (*See* GFX 5, at 4, 7, 12, 25, 26, 30.) It

did not object to Westlaw charges billed in the Arbitration matter between November 17,

2007 and April 11, 2008 in the aggregate sum of $8,691.76, or $2,153.37 in Westlaw

charges billed in the Merida matter in August 2008. However, Ridgemour contends

that the expenses incurred in connection with computer legal research are part of office

overhead and should not be charged to the client. (*Ridgemour Proposed Findings* at 12-

13.)

Both sides discuss the recoverability of computer research costs under the

Federal Rules of Civil Procedure or various fee-shifting statutes. Prior to 2004, charges

for computer legal research were not a taxable cost under FED. R. CIV. P. 54, or

separately compensable as part of a fee award. *See, e.g., United States ex rel. Evergreen

Pipeline Const. Co. v. Merritt Meridian Const. Corp.*,  95 F.3d 153, 173 (2d Cir.1996)

("[C]omputer research is merely a substitute for an attorney's time that is compensable

under an application for attorneys' fees and is not a separately taxable cost."); *BD v.

DeBuono*, 177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001) ("Westlaw fees are simply an item of

overhead, and as such should be built into the fees charged, rather than unbundled and

reimbursed separately"); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 305

(S.D.N.Y. 2001) ("It is well established that 'computer research is merely a substitute for

an attorney's time that is compensable under an application for attorneys' fees and is

not a separately taxable cost.') (quoting *United States v. Merritt–Meridian Constr.

Corp.,* 95 F.3d 153, 173 (2d Cir.1996)); *Tri-Star Pict., Inc. v. Unger*, 42 F. Supp. 2d 296,

306 (S.D.N.Y. 1999) (same).

However, in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of

Albany*, 369 F.3d 91 (2d Cir. 2004), the Second Circuit distinguished *Merritt Meridian*

as a decision concerning Rule 11 sanctions, and ruled that charges for computer legal

research were separately compensable under fee-shifting statutes if the applicant

normally billed its clients for the cost of online computer research. *Id.* at 98 ("We agree

that the use of online research services likely reduces the number of hours required for

an attorney's manual search, thereby lowering the lodestar, and that in the context of a

fee-shifting provision, the charges for such online research may properly be included in

a fee award."). Since *Arbor Hill*, courts in this Circuit have routinely allowed an

applicant under a fee-shifting statute to recover the charges for computerized legal

research. *See, e.g., SEC v. Universal Express, Inc.*, No. 04 Civ. 2322(GEL), 2009 WL

1835915, at *13 n. 20 (S.D.N.Y. June 25, 2009) (quoting *Arbor Hill*); *M.K. ex rel. K v.

Sergi*, 578 F. Supp. 2d 425, 434-35 (D. Conn. 2008) (collecting cases); *J.S. Nicol, Inc. v.

Peking Handicraft, Inc.*, No. 03 Civ. 1548(GBD)(AJP), 2008 WL 4613752, at *18

(S.D.N.Y. Oct. 17, 2008) ("Law firms and attorneys, therefore, who treat the cost of

computerized research as overhead are not entitled to attorneys' fees for those costs,

while-as the Second Circuit has now made clear-those attorneys who pass these

expenses on to clients as separately chargeable disbursements should be reimbursed in an attorney's fees award."); *Cheesecake Factory Assets Co. v. Philadelphia Cheese Steak Factory Inc.*, No. 05-CV-3243 (NGG)(RML), 2008 WL 2510601, at *6 (E.D.N.Y. June 20, 2008) ("Post-*Arbor Hill* decisions in this district have allowed reimbursement for computerized research.")  At least one District Court in this district has applied the same rule in a diversity case under a New York law fee-shifting regulation.  *See Insinga v. Cooperatieve Centrale Raiffeisen Boerenleenbank B.A.*, 478 F. Supp. 2d 508, 512-13 (S.D.N.Y. 2008) ("The Second Circuit has made clear, though, that 'charges for such online research may properly be included in a fee award.'") (quoting *Arbor Hill*, 369 F.3d at 98).

    This case concerns the recoverability of computer legal research under New York contract law, and does not involve a fee-shifting statute.  The Retainer required Ridgemour "to reimburse [GF] for any costs and expenses advanced or incurred, including, for example, long distance telephone, overnight mail and messenger services and court fees."  (GFX 1, at ¶ 4.)  "Including" is synonymous with the phrase "without limitation" and is not restricted to the examples that "including" precedes.  *Bekhor v. Bear, Sterns & Co.*, No. 96 Civ. 4156(LMM), 2004 WL 2389751, at *5 (S.D.N .Y. Oct. 25, 2004) ("The phrases 'including' and 'without limitation' are redundant in that each asserts a breadth of coverage beyond the item or items that those phrases immediately precede.  *See* 11 Williston on Contracts § 30.11 & n. 74.  Those phrases each mean that the lists following them are not exhaustive and do not in any way restrict the scope of the provision."); *In re WorldCom, Inc.*, No. 02–13533(AJG), 2007 WL 162782, at *6 (Bankr. S.D.N.Y. Jan. 18, 2007) ("The phrase used, 'including without limitation,' is a

43

redundant phrase with 'including' and 'without limitation' each simply meaning that the list that follows is not exhaustive."); *see St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996) ("[T]he challenged list of provisions in St. Paul's contract is prefaced by the word 'including,' which is generally given an *expansive* reading, even without the additional if not redundant language of 'without limitation.'") (emphasis in original) (interpreting Texas law). Westlaw charges fall into the category of costs and expenses incurred by GF, GF itemized and billed those charges to Ridgemour, and Ridgemour paid the Westlaw charges until it stopped paying the bills altogether. Accordingly, the portion of GF's claim for computer legal research is allowed, except for the charges incurred in connection with the Arbitration matter after July 21, 2008 in the aggregate sum of $1,417.83 and the post-petition charges incurred in the Merida matter in the aggregate sum of $1,392.61. Both of these sums have already been subtracted in arriving at the sum of $259,606.71, the allowed amount of the Claim.

## E.    GF's Bankruptcy-Related Services

Finally, Ridgemour contends that GF billed it for bankruptcy advice on the occasions previously noted, Ridgemour did not retain GF to render bankruptcy advice, there was no need for bankruptcy advice, (*Ridgemour Proposed Findings* at 12), and "GF abandoned the arbitration and coerced the debtor to file bankruptcy in order to protect GF's illegal and deceitful conduct." (*Ridgemour Proposed Conclusions* at 42.) The Court has already disallowed any time billed after July 21, 2008, so the focus is on the bankruptcy-related entries identified by Ridgemour on April 28-30, June 20, June 26 and July 17.

44

In considering a lawyer's fee, the Court does not view the reasonableness or necessity of the services in hindsight, but instead, whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *accord Alicea v. City of New York*, 272 F. Supp. 3d at 609.  Although Ridgemour contends that there was no need for bankruptcy advice in April, (*Ridgemour Proposed Findings* at 12), the facts suggest otherwise.  Before the Arbitrator rendered his decision on June 18, 2008 that the Property should be returned to Ridgemour, Rotonde testified that Ridgemour, and presumably GF, did not think that the arbitration was successful, (Tr. (12/11/17) at 109:11-20), and was pleasantly shocked by the Arbitrator's June 18th decision.  (Tr. (12/11/17) at 109:21-23.)  Before then, when the outcome was bleak, and Ridgemour admits that Carbone "was exploring whether bankruptcy might be strategically necessary to stop [the Arbitrator] from ruling adverse to [Ridgemour]." (*Ridgemour Proposed Findings* at 26.)  Moreover, GF's time records indicate that Rotonde participated in conference calls with Carbone regarding bankruptcy on April 28 and April 29, and met with Carbone and Robert Rattet, a bankruptcy lawyer, on April 30, 2008.  (GFX 3 (July 1, 2008 statement).)  Thus, these services were reasonable and necessary when they were rendered.

The time records also indicate conference calls between Carbone and Rattet on June 20 and the preparation of a letter to Rattet on June 26 adjourning a meeting, presumably about bankruptcy.  The conference calls occurred after the Arbitrator had issued his initial rulings that the Property would be returned to Ridgemour and Ridgemour would give GDC a mortgage to secure its damage claim and an indemnity

agreement, but before the Interim Award.  It appears that bankruptcy or bankruptcy-related issues were still under consideration but the meeting with Rattet was tabled.  Ridgemour's counsel did not question Carbone about these charges, and since bankruptcy considerations were ongoing, the services were reasonable and necessary when rendered.

Lastly, Ridgemour challenges certain bankruptcy-related time entries by Carbone on July 17, 2008.  The Court has already discussed the July 17th activities, which involved consultations between and among Carbone, Rotonde and Rattet.  The principal issue apparently related to whether the Interim Award allowed Ridgemour to record the deeds, and what would happen if it did and thereafter filed for bankruptcy.  While Carbone and Rotonde gave contrasting accounts of what was discussed, it is evident that bankruptcy was on the table, and had to be considered in connection with the Arbitration and the deeds.  Carbone's participation was necessary, and the services were reasonable.

One remaining point concerns Ridgemour's charge that Carbone advised it to file bankruptcy to cover up his deceitful and illegal actions.  (*Ridgemour Proposed Findings* at 26 ("By August, Carbone wanted his illegal and deceitful actions frozen in place and bankruptcy was his chosen vehicle."); *Ridgemour Proposed Conclusions* at 42 ("After being paid more than $500,000 in attorney fees GF abandoned the arbitration and coerced the debtor to file bankruptcy in order to protect GF's illegal and deceitful conduct.").)  The charge was unsubstantiated at trial, and Ridgemour provided a contrary explanation to this Court when it opposed the Trustee Motion.  Initially, when Ridgemour filed bankruptcy, it was represented by Marc Stuart Goldberg, not Rattet

46

who was Carbone's choice.  (Tr. (12/11/17) at 151:6-13.)  In opposing the Trustee Motion,

Ridgemour submitted declarations from Meyer and Rotonde and a lengthy pleading

signed by Goldberg which attributed the need for bankruptcy to the Arbitrator's August

4, 2008 ruling and the multiplicity of litigations involving Ridgemour.  As explained by

Ridgemour's bankruptcy counsel:

> That directive, dated August 4, 2008, would not only have forced the
> Properties into foreclosure, it contradicted three previous rulings by the
> same arbitrator that had restored the Properties to the Debtor after more
> than four years of tortuous litigation and delay.  Compliance would have
> undone that very outcome, benefited GDC to the detriment of all other
> creditors, and ultimately meant the end of the Debtor as we know it.

(GFX 12, at ¶ 4) (footnote omitted).)

In addition, Ridgemour's allegation makes little sense.  First, the heightened

transparency that attends a bankruptcy case would expose rather than hide any illegal or

deceitful conduct.  Second, Ridgemour owed GF a substantial amount of unpaid fees,

and bankruptcy jeopardized recovery of those fees.

### CONCLUSION

The Claim is allowed in the amount of $259,606.71, and Ridgemour is directed to

pay that sum, plus post-petition interest, in accordance with the Plan.  The motions *in

limine* are denied.  The Court has considered the parties' other arguments and concludes

that they are meritless.  The foregoing constitutes the Court's findings of fact and conclusions of law.  Settle order on notice.

Dated:   New York, New York
          May 18, 2008

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge

48